CASSAR v. EMPLOYMENT SECURITY COMMISSION

1. UNEMPLOYMENT COMPENSATION—ELIGIBILITY TO BENEFITS—BURDEN OF PROOF.

    Party claiming unemployment compensation benefits has the burden of proving eligibility therefor (CLS 1952, § 421.29).

2. SAME—COURT REVIEW—CERTIORARI—GREAT WEIGHT OF THE EVIDENCE.

    The review of the Supreme Court under the employment security act is limited to a review of the circuit court judgment in certiorari wherein reversal may be had only if the decision reviewed by the circuit court is against the great weight of the evidence (CLS 1952, § 421.38).

3. SAME—DISQUALIFICATION FOR BENEFITS—MISCONDUCT.

    Finding of the employment security commission, referee and appeal board that claimants for unemployment compensation benefits were guilty of misconduct disqualifying them for benefits for duration of unemployment may not be said to be against the great weight of the evidence, where it appears that they walked off the job without waiting to pursue union

REFERENCES FOR POINTS IN HEADNOTES

[1] 48 Am Jur, Social Security, Unemployment Insurance, and Retirement Funds § 34 et seq.

[2, 5] 48 Am Jur, Social Security, Unemployment Insurance, and Retirement Funds § 49.

[3, 4] 48 Am Jur, Social Security, Unemployment Insurance, and Retirement Funds § 38.

[3, 4] What amounts to "misconduct" which precludes benefits under unemployment compensation act to discharged employees. 146 ALR 243.

[6, 7] 48 Am Jur, Social Security, Unemployment Insurance, and Retirement Funds § 36.

[6, 7] Construction and application of provisions of unemployment compensation or social security acts regarding disqualification for benefits because of labor disputes or strikes. 28 ALR2d 287.

[9] 48 Am Jur, Social Security, Unemployment Insurance, and Retirement Funds § 44.

[10] 14 Am Jur, Costs § 37.

contract grievance procedure for employer's discharge of president of union because of alleged violation of the company rules and so many employees left work that plant was shut down for upwards of 3 weeks (CLS 1952, §§ 421.29, 421.38).

**4. SAME—MISCONDUCT.**

Misconduct within the meaning of an unemployment compensation act excluding from its benefits an employee discharged for misconduct must be an act of wanton or wilful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has the right to expect of his employee, or negligence in such degree or recurrence as to manifest culpability, wrongful intent, or evil design, or show an intentional, and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer (CLS 1952, §§ 421.29, 421.38).

**5. SAME—FINDINGS OF COMMISSION—EVIDENCE—COURTS.**

Findings of various reviewing officers of employment security commission as ultimately presented by the appeal board are binding upon a reviewing court, where supported by competent evidence (CLS 1952, § 421.38).

**6. SAME—DISQUALIFICATION FOR BENEFITS—VIOLATION OF UNION CONTRACT—MISCONDUCT.**

Action of claimants for unemployment compensation benefits in remaining away from work when they had no grievance or dispute concerning their conditions of employment, in clear violation of union contract barring walkouts, constituted wilful misconduct disqualifying claimants from benefits, especially where it resulted in plant being closed because of insufficient employees to operate it (CLS 1952, § 421.29).

**7. SAME—GRIEVANCE OF FELLOW EMPLOYEE—SHUT DOWN OF PLANT —ABSENCE OF LABOR DISPUTE—DISQUALIFICATIONS FOR BENEFITS.**

The action of claimants for unemployment compensation benefits, in making the grievance of a fellow employee their own, refusing to work and forcing a shut down of operations in the plant notwithstanding there was no labor dispute affecting claimants, constituted a breach of contract between the union and the company and was in derogation of the standards of conduct the employer was entitled to expect from them and disqualified them for benefits (CLS 1952, § 421.29).

8. SAME—BENEFITS—STATUTES.

The right to unemployment compensation benefits rests wholly on the statute (CL 1948 and CLS 1952, § 421.1 *et seq.*).

9. SAME—BENEFITS—CONSTRUCTION OF STATUTE—INTENT.

The statutory provisions pertinent to a claim for unemployment compensation benefits must be construed and applied in accordance with the obvious legislative intent (CL 1948 and CLS 1952, § 421.1 *et seq.*).

10. COSTS—UNEMPLOYMENT COMPENSATION—CONSTRUCTION OF STATUTES.

No costs are allowed in proceeding to recover unemployment compensation benefits involving the interpretation and application of statutory provisions of general interest (CL 1948 and CLS 1952, § 421.1 *et seq.*).

SMITH, J., dissenting.

Appeal from Ingham; Salmon (Marvin J.), J. Submitted April 13, 1955. (Docket Nos. 6–13, Calendar Nos. 46,395–46,402.) Decided October 3, 1955. Rehearing denied December 1, 1955.

Applications by Francis J. Cassar and 7 others for benefits under the Michigan employment security act following discharge growing out of industrial controversy. Claims for unemployment compensation denied on basis of misconduct rather than on basis of labor dispute. Claimants individually proceeded in circuit court against Employment Security Commission, its appeal board, and the Precision Manufacturing Company, to absolve themselves of the charge of misconduct, thus enabling them to preserve certain wage credits. Cases consolidated for trial and on appeal. Affirmed.

*Zwerdling, Zwerdling, Keith & Livingston (A. L. Zwerdling,* of counsel on application for rehearing), for plaintiffs.

*Thomas M. Kavanagh,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *Arthur W. Brown,* Assistant Attorney General, for defendant Employment Security Commission, asking reversal.

*A. D. Ruegsegger* and *Dyer, Angell & Meek,* for defendant Precision Manufacturing Company.

SMITH, J. (*dissenting*). On the morning of October 24, 1952, Floyd Buckingham, president of Local 56 of the UAW-CIO (hereafter termed the union), was discharged by his employer, defendant and appellee Precision Manufacturing Company (hereafter termed the company). This action on the part of the company brought in its wake the various incidents which have culminated in the appeal.

It is stipulated that the reason given by the company for the discharge was Buckingham's misconduct connected with the work. The company's letter to the union stated that he had "wilfully misused the property of the company, so as to endanger our property, and the lives of others." Buckingham himself told the men that he had been discharged because he had failed to dress his grinding wheel for the night grinder and that he had worked right up to quitting time the preceding night and had had no chance at all to dress the wheel. He asserted that he had been "framed," and so told his fellow workers. The union grievance, filed within some 20 minutes, was that the company had "fired union officer with no reason at all." A strike appears to have been imminent at this point, for the foreman, speaking to Buckingham "and other union commit-

teemen and 10 or 15 others close by," took occasion to remind them all of the provisions of the union's ·contract with the company with respect to discharge and appeal therefrom. It was Buckingham's position, however, that the company itself had not followed contract procedure and had itself violated the contract. As he left the plant "some of the men followed him."

The plant manager then entered the shop. No one was working and 15 men were outside. All within range of his voice were warned that any men who were not inside and ready to work at 8 o'clock would be discharged. Most of the men, however, were unpersuaded. They wanted, they testified, to find out "what was what," to find out "why a fellow employee had been discharged." Consequently, the majority of the day shift failed to report for work at 8 o'clock and were discharged. The plant was completely closed down from October 24th to November 18th because of the controversy hereinabove described.

Subsequent to October 24th, Francis J. Cassar, appellant herein, together with other appellants (all of whom will hereinafter be termed claimants) filed their claims for unemployment benefits under the Michigan employment security act (CL 1948 and CLS 1952, § 421.1 et seq. [Stat Ann 1950 Rev and Stat Ann 1953 Cum Supp § 17.501 et seq.]). All, it should be noted, were among those who walked out at the time of the controversy described. Notices of determination were received by claimants in due course, stating as follows:

"Your unemployment is due to a stoppage of work caused by a labor dispute. You are disqualified from 10–24–52 through the duration of your unemployment due to such work stoppage as provided by section 29 (1) (b) of the act."*

---

* CLS 1952, § 421.29 (Stat Ann 1953 Cum Supp § 17.531).— ·Reporter.

The company having protested such determination, the matter was reconsidered, whereupon a further determination was issued (December 12, 1952) holding that the claimants were disqualified from October 24, 1952 through the duration of their unemployment for misconduct connected with their work under the provisions of section 29 (1) (a) (2) of the act, and that 30 credit weeks and wages earned with the employer during the base period were cancelled.

This further determination, it is stipulated, was similarly protested by the claimants, and on December 22, 1952 the commission issued a redetermination. This redetermination held that the claimants were disqualified from October 24, 1952 through the duration of their unemployment for misconduct in connection with their work in accordance with section 29 (1) (a) (2) of the act and that 30 credit weeks and wages earned between December 2, 1951 and October 24, 1952 were cancelled. Upon appeal of this redetermination to a referee of the commission, decision affirming was issued, and on further appeal the decision of the referee was affirmed both by the appeal board and then by the circuit court. Appeal was then taken by claimants to this Court. The 8 cases involved in this appeal had been consolidated for hearing before the circuit court and are before us on a consolidated stipulation of facts.

The positions of the parties may be very simply stated. Claimants assert that they were involved in a labor dispute and that the section of the act specifically dealing with labor disputes (section 29 [1] [b]) should govern their disqualification for benefits under the act. The Michigan employment security commission (hereinafter termed the commission) supports this position. The company, on the other hand, contends that, in view of the provisions of the contract existing between the union and

the company, the action taken by the claimants was a breach of such contract and that it therefore involved misconduct. From this premise the company asserts that the misconduct section of the act (section 29 [1] [a] [2]) is applicable and that it should govern the disqualification rather than the labor dispute section (section 29 [1] [b]). The difference between the 2 sections is far from academic. The misconduct section is the more severe. Disqualification under it is for the entire period of unemployment rather than merely the period of the work stoppage. Moreover, disqualification thereunder takes from the workman his wage credits earned with the employer involved, with consequent curtailment or cessation of benefits at some future time even though he is then unemployed and otherwise eligible for benefits.

We note at this point our rejection of the defendant commission's theory of the proceedings below, that the case involves a disqualification under section 29 (1) (b) of the act, accompanied by a further and additional disqualification under section 29 (1) (a) (2). Although this position finds some support in language of the further determination of the commission, dated December 12, 1952, it is not consistent with the stipulation of facts entered into by all parties to the appeal. It is our conclusion from the stipulation, read as a whole, as well as the record, that the question to be resolved is whether claimants are disqualified under the misconduct, or under the labor dispute, section of the act.

We are not, in interpreting this act, traveling wholly uncharted seas. Our Court has heretofore considered and enunciated its standards of interpretation of this act:

"The purpose of the unemployment compensation act is to relieve the distress of economic insecurity due to unemployment. It was enacted in the interest

of public welfare to provide for assistance to the unemployed and as such is entitled to a liberal interpretation." *Godsol* v. *Unemployment Compensation Commission*, 302 Mich 652 (142 ALR 910).

It is with such canon of statutory construction in mind that we approach the determination of the matter before us. We agree with appellee company that the basic question is whether breach of an existing contract is misconduct within the meaning of the act. We are not, it will be noted, dealing with matters of violence or sabotage in connection with strikes, lockouts or walkouts. Whether such acts subject the worker to disqualification for "misconduct connected with his work," to use the statutory language, as well as criminal sanctions, we do not here decide. This is breach of contract, not breach of the peace.

A brief survey of the act discloses that not all of the unemployed are compensable. A worker may be ineligible for certain reasons or he may be disqualified for benefits. All States, Michigan included, prescribe some disqualifications. Reference to the disqualification section of our act (section 29) will disclose that its first subsection (a) includes the cases of personal fault. Here we encounter the individual who quits "without good cause attributable to the employer," who is discharged for "misconduct in connection with his work," or who is intoxicated "while at work." As to him, our act provides that he shall be disqualified for compensation during the entire period of his unemployment and that his wage credits earned with the employer in question shall be taken from him. The succeeding subsection (b) is the labor-dispute subsection. While its disqualifications are more severe than those of certain other States (*e. g.*, New York labor law, § 592 [1],* limiting such disqualification to 7 weeks),

---

* 30 CLNYA, § 592, subd 1.—REPORTER.

it does not require a cancellation of wage credits nor impose disqualification for longer than the period of work stoppage.

Upon the facts above stated, there can be no question but that a labor dispute of a serious nature existed between the employer and claimants. To argue otherwise is to ignore the economic realities involved. The president of the union had been discharged, he asserting that it was without cause and on manufactured evidence, i. e., a "frame." His fellow employees refused to go to work until they learned why he had been discharged and "what was what." The plant was necessarily closed and the stoppage was due to this dispute. Although the act under consideration gives us no definition of the term "labor dispute," the situation here outlined falls within any reasonable scope thereof since it involved the tenure of employment of the union representative. At this point we would seem to have an orthodox case, simply involving the application of section 29 (1) (b), "a stoppage of work existing because of a labor dispute in the establishment."

It is, however, as heretofore noted, the company's position that the action of the claimants violated the contract, and that the breach thereof constituted misconduct. The judgment of the circuit court, which we are here reviewing, *Godsol* v. *Unemployment Compensation Commission,* 302 Mich 652 (142 ALR 910), adopts substantially the theory of the company, and of certain intermediate Pennsylvania courts, that violation of the workers' duty under their contract did, in fact, bring them within the misconduct sections of the act. Lest there be misunderstanding as to remedy, we point out that there is no dispute over the proposition that upon breach of contract, properly proven, the company has the usual damage remedy. *General Magnetic Company* v. *United Electrical Radio & Machine Workers of America, Local*

*937, CIO,* 328 Mich 542. Here, however, a different sanction for the breach is sought to be applied, that for "misconduct connected with his work." The phrase is not defined in the act. Its juxtaposition with "intoxication while at work" would, however, indicate that it is a breach of those standards of conduct reasonably applicable to the industrial task assigned, rather than of those standards of ethics and morals applicable to mankind in general. In an ethical sense, of course, any conduct reasonably offensive to an employer might be described as misconduct but the purposes of the act do not permit an interpretation so broad. Thus an employee's suit against his employer for a statutory penalty under the wage and hour law,* filed without warning or effort to adjust, although in a broad sense "connected with his work" and described by the Missouri court as both "discourteous and unfriendly" was not misconduct within the meaning of the act. *M.F.A. Milling Co.* v. *Unemployment Compensation Commission,* 350 Mo 1102 (169 SW2d 929, 146 ALR 239). On the other hand, an employee's repeated absences from work, together with delays in reporting therefor and other infractions of working regulations, was held to be misconduct in *Checker Cab Co.* v. *Industrial Commission,* 242 Wis 429 (8 NW2d 286).

Is, then, a breach of contract misconduct? Were we framing a new code of laws, and looking to the past for guidance, we would find much to warrant such treatment of any violation of a covenant agreed to be kept. Thus under the Roman law of the Twelve Tables the contract violator might be executed or he might, with mercy, not lose his life but merely be sold into slavery. Jolowicz, Historical Introduction to Roman Law, p 189 *et seq.*; Wenger

---

* See 29 USCA, § 201 *et seq.*—REPORTER.

(Fisk translation.), Institutes of the Roman Law of Civil Procedure (Rev ed), p 222 *et seq*. Even as recently as the early English law, breaches of some contracts carried tortious connotations, implications of misconduct. The gist of certain actions on express promises was the deceit of the defendant in not acting in accordance with his promise. See Ames, Lectures on Legal History, p 129 *et seq*. But our contract law has forsaken the paths of revenge, and crime, and tort. Mr. Justice Holmes in his address, "The Path of the Law," 10 Harvard L R 457, 462, summarized our modern thought in these words:

"The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it,—and nothing else. If you commit a tort, you are liable to pay a compensatory sum. If you commit a contract, you are liable to pay a compensatory sum unless the promised event comes to pass, and that is all the difference. But such a mode of looking at the matter stinks in the nostrils of those who think it advantageous to get as much ethics into the law as they can. It was good enough for Lord Coke, however, and here, as in many other cases, I am content to abide with him. In *Bromage* v. *Genning*,\* a prohibition was sought in the King's Bench against a suit in the marches of Wales for the specific performance of a covenant to grant a lease, and Coke said that it would subvert the intention of the covenantor, since he intends it to be at his election either to lose the damages or to make the lease. Sergeant Harris for the plaintiff confessed that he moved the matter against his conscience, and a prohibition was granted. This goes further than we should go now, but it shows what I venture to say has been the common-law point of view from the beginning, although Mr. Harriman,

---

\* 1 Roll Rep 368.—Reporter.

in his very able little book upon Contracts has been misled, as I humbly think, to a different conclusion."

We do not gather from the above that Mr. Justice Holmes was unconcerned with the sanctity of contract. The question, however, is how such sanctity is to be preserved. We usually apply a damage remedy upon proof of violation and we sometimes specifically enforce a contract, though such enforcement of a contract for work and labor, absent the *Lumley* v. *Wagner* situation ([Chan] 1 DeG M & G 604 [42 Eng Rep 687, 21 LJ Ch 898]), presents, at least in this country, some obvious constitutional difficulties. Here, however, as noted, we are asked to take an additional step; to find that a breach of contract in and of itself is misconduct, and, having so characterized the breach, then to apply the severe penalties of the misconduct section of the act.

Difficulties obtrude. If the commission is to enter upon the moral evaluation demanded of it, if it (and eventually this Court) is to resolve whether the conduct is good or bad, there will eventually have to be a weighing of the merits of such labor dispute as a condition precedent to the payment of benefits under the act. This is a formidable task, even for the courts, in view of the mass of charges and countercharges made in the usual dispute. In the case at bar, for instance, had, in fact, as the union's president asserted, the company committed a substantial prior breach at the time of the claimants' walkout?

While the company insists that the contract violation was "clear" and thus, presumably, without justification, we may be permitted some doubts. It takes a very skillful housewife to pour a pancake having only one side. Some States, it is true, have enacted statutes which require a determination of fault as to certain issues (see 49 Michigan L R 886, 893), but the utility of this type of statute is open to the most

serious question. However that may be, our legis-
lature has not seen fit to direct such a course of
action and we are not disposed to read it into the act.
We have heretofore indicated, in similar though not
parallel cases, that so far as the administration of
the employment security act is concerned, the State,
through its agencies, will not weigh the merits of
the controversy, will not decide who is bad and who
is good, will not commend the one or chastise the
other. The employment security act was designed
to alleviate the distress of unemployment, not to
scourge the wicked or reward the faithful. See *Law-
rence Baking Co.* v. *Unemployment Compensation
Commission,* 308 Mich 198 (154 ALR 660); *Chrysler
Corporation* v. *Smith,* 297 Mich 438 (135 ALR 900);
and *Intertown Corporation* v. *Unemployment Com-
pensation Commission,* 328 Mich 363.

There can be no doubt that what the company is
seeking is the imposition of a statutory penalty.
We agree, in this construction of the act, with the
Wisconsin court that the loss of benefit rights be-
cause of misconduct connected with the employment
imposes "a forfeiture or penalty on the employee,"
*Boynton Cab Co.* v. *Neubeck,* 237 Wis 249 (296 NW
636). We are reluctant to embark upon a course
of preserving the sanctity of contract by the sug-
gested enforcement and remedial device, going be-
yond damages and specific performance and into the
field of penalty. Particularly is this true with ref-
erence to a labor contract. The interpretation of
a breach of such contract as misconduct will have
the inevitable effect of exercising compulsion against
labor to refrain from enforcing its legitimate de-
mands. For should the judgment of its leaders, or
counsel, prove faulty and the action found not war-
ranted by the contract, penalties for misconduct
will ensue. There is, it will be noted, no correspond-

ing penalty assessed against the other contracting party, the company, in event of its similar breach.

Our views on this aspect of the case find support in our sister State, Wisconsin, where the court, in construing the corresponding misconduct section of the Wisconsin act, held as follows in *Boynton Cab Co.* v. *Neubeck, supra* (p 259):

"In view of these consequences which would thus result if the provision as to misconduct, under which an employee may become subjected to the forfeiture, must be deemed applicable to all types of 'misconduct' that can be considered to be within the broad scope of that term (as defined in the above quotation from 40 CJ [Misconduct, § 1, pp 1220, 1221]), and in view of the ambiguous or doubtful import in its meaning as used in the statute, it is necessary and proper to resort to the rule that statutes providing for forfeitures are to be strictly construed and terms and provisions therein, which are ambiguous or of doubtful meaning, will be given the construction which is least favorable to working a forfeiture, so as to minimize the penal character of the provision by excluding rather than including conduct or cases not clearly intended to be within the provision. 'Where the purpose is uncertain, the language should be read strictly to soften its severity; where otherwise, it would express a meaning which would be unreasonably harsh.' "

Finally, the misconduct theory is itself an anachronism. There is perhaps no more melancholy chapter in the whole history of labor's efforts to improve its lot than the attempt to penalize a workman's breach of his contract of hire by the application to him alone of grossly severe penalties. See, in general, Howell, Labour Legislation, Labour Movements and Labour Leaders (2d ed). It has never, so far as we know, in modern times even been suggested that the breach of an ordinary business con-

tract be made a crime, or a tort. Yet as recently as the turn of the century, statutes in this country sought to make a criminal act of a laborer's breach of his contract of employment. The words of a court in holding such a statute unconstitutional will bear constant repetition when efforts are made to penalize breaches of laboring contracts by devices beyond the normal damage remedies.

"Whatever may be the remedy for existing conditions, certainly the remedy is not to be found in statutes which chain him to the soil and force him to labor, whether he will or not. Human nature revolts at it, and he will escape it if he can. It is by improving his condition, and not still further degrading it, that the remedy may be found." *Ex parte Drayton*, 153 F 986, 997.

In the case before us the effort made is not to interpret the breach of contract as criminal but as involving misconduct and forfeiture, as sounding in tort. But it will, equally with a criminal sanction, have the coercive effect above described, for it will, equally with the criminal sanction, tend to prevent the exercise of the individual's free will by the threat of imposition upon him of punishment or penalty. This is not the aim of the civil law, which looks rather to the compensation of the person wronged, and certainly it is not in accord with the beneficent intendments of the legislature in passing the employment security act, nor with a liberal construction thereof.

Our conclusions herein are fortified by our review of *Intertown Corporation v. Unemployment Compensation Commission, supra.* There the issue, as in the case at bar, was, in a strike situation, whether one of the personal fault disqualifications (that for voluntarily quitting, section 29 [1] [a] [1]) should be applied, or the labor dispute subsection.

In holding the latter to be applicable, the Court said (p 366):

"The only question, therefore, is whether claimants left work voluntarily without good cause attributable to the employer. (CL 1948, § 421.29 [1] [a] [1] [Stat Ann § 17.531 (1) (a) (1)].)

"In maintaining its neutral position in employer-employee relations, the State has established statutory bases of disqualification for unemployment benefits. The disqualifications of subsection (a) are for the duration of unemployment, and this includes the voluntary leaving of work by the employee. The following subsection (b) disqualifies the employee for those weeks of his unemployment which are due to stoppage of work because of a labor dispute in which he is directly involved. This specific provision in regard to the labor dispute disqualification indicates that such should not be within the reach of the 'voluntary leaving' of section 29 (1) (a) (1). *In the Matter of Landaal,* 273 Mich 248.

"This Court need not characterize the 'fault' in the strike. Unemployment compensation does not depend upon the merits of a labor dispute. *Lawrence Baking Co.* v. *Unemployment Compensation Commission,* 308 Mich 198 (154 ALR 660)."

The *Landaal Case,* referred to above, is equally pertinent to the situation now presented (pp 252, 253).

" 'That where there are 2 acts or provisions, one of which is special and particular, and certainly includes the matter in question, and the other general, which, if standing alone, would include the same matter and thus conflict with the special act or provision, the special must be taken as intended to constitute an exception to the general act or provision, especially when such general and special acts or provisions are contemporaneous, as the legislature are not to be presumed to have intended a conflict.' " (*Crane* v. *Reeder,* 22 Mich 322, 334.)

We note, also, the decision of the Alabama court in *T. R. Miller Mill Co., Inc.,* v. *Johns,* 37 Ala App 477 (75 So2d 670), *T. R. Miller Mill Co., Inc.,* v. *Johns,* 261 Ala 615 (75 So2d 675). This case also involved striking workers, the contention being made "that the employees in striking violated their contract with their employer and that such a controversy was not a labor dispute within the meaning of the statute." After an exhaustive discussion of the authorities, including the decision of our Court in the *Lawrence* and *Intertown Cases, supra,* the court held, in part, as follows (pp 619, 620):

"This court is aware of the sanctity of contract and does not intend to disturb its utility to our society, but the unemployment compensation act is not designed to be used as an instrument with which to force compliance with other legal precepts. This principle is illustrated by the following cases which hold that an industrial controversy is not prevented from being a labor dispute just because one of the parties may be breaching a contract. * * *

"Thus, in our view, a fair construction of subsections A and B, *supra,* would be that if employees are disqualified for benefits under subsection A when their unemployment was directly due to a labor dispute, regardless of whether they were right or wrong in the controversy, subsection B, in fairness, could not be construed to mean that they left their work voluntarily when forced out of work by a labor dispute. And according to the facts set out in the opinion of the court of appeals, there was a 'labor dispute' in the instant case.

"But, as pointed out earlier, petitioner contends that even if there was a labor dispute within the meaning of subsection A of [Code 1940, title 26] § 214, the claimants still should be disqualified, for they struck in violation of their contract and this constituted a voluntary leaving of their employment

'without good cause' as set out in subsection B. So although the courts have persistently refused to consider the merits of a labor controversy under provisions such as our subsection A, petitioner now seeks to have us do it under subsection B. There would seem to be no basis for the 'regardless of merit' interpretation of subsection A if by virtue of subsection B a worker was to be disqualified anyway every time he was 'wrong.' Under subsection A the claimant is disqualified so long as the dispute continues even if the employer is 'wrong.' Yet petitioner asks us to hold that under subsection B the worker is disqualified after the dispute is settled if he was in error in the dispute. So construed, the disabilities imposed by subsection B would then be a penalty against the worker for being wrong but no corresponding sanction would be imposed on the erring employer. We do not think the Alabama unemployment compensation law affords a basis for such result."

An attempt is made to distinguish this case. It is said that in this case the voluntary quit clause of the statute is relied upon, while in the case at bar defendant company relies on the misconduct clause. The distinction is not tenable. We do not deny that these clauses are in some respects different. Some acts would fall within one of these clauses though not within the other. Yet these clauses are alike so far as concerns the situation before the Alabama court and so far as concerns the situation before this Court. In each of these cases the workman's acts can be described by the words "voluntary quit" and "misconduct" if these words are taken out of the context and their meaning is sought, like that of some obscure word in a poem, in Noah Webster's Unabridged Dictionary. But this Court, like the Alabama court, is called upon to construe these words in the context of the employment security act. The Alabama court held that the workman who goes

out on strike does not "voluntarily quit" within the meaning of the statute because, substantially, (a) his action is explicitly covered by the other section of the statute wherein the legislature lays down the rules for the labor dispute situation, (b) because the sanction provided in the labor dispute section is more appropriate to the strike situation, and (c) because a weighing of the merits of a labor dispute is not contemplated by the act. The reasons for that decision apply exactly to the case at bar. The company cannot escape the meaning and force of the Alabama case, or of our *Intertown Case, supra,* by merely shifting from one of the general clauses of section 29 (1) (a) to another of the general clauses of section 29 (1) (a). No more can it escape the rules provided by the legislature of our State for the strike situation by shifting from the labor dispute section (29 [1] [b]) to one of the personal fault clauses in section 29 (1) (a). This is a labor dispute and it is governed by the labor dispute section of the act.

The decisions of the intermediate Pennsylvania courts relied upon by the circuit court do not commend themselves to us insofar as they are inconsistent with the views herein expressed, although the differences in result may, as urged by claimants' counsel, stem from statutory differences in our respective jurisdictions.

The judgment of the circuit court should be reversed. No costs, a public question being involved.

CARR, C. J. The facts in this matter are not in dispute. On October 24, 1952, and for some time prior to that date the Precision Manufacturing Company was engaged in business at West Branch, Michigan. It had in its employ approximately 40 men on the day shift. On said date one of the employees, Floyd Buckingham, was discharged for an alleged

violation of the company rules.  This occurred at 7 o'clock in the morning when Buckingham appeared for work.  He was requested not to go out in the plant, but did so, advising his fellow workers that he had been "framed".

A foreman for the employer reminded the workmen that under the contract between the company and the union a discharged employee had the right to appeal.  The suggestion was further made that the men go to work and that the prescribed grievance procedure should be followed in Buckingham's case.  However, some of the men left with Buckingham, and when the manager entered the plant at 7:30 approximately 15 men were outside the building and 25 within.  None of the latter was working.  Thereupon the manager advised those within the sound of his voice that all who were not inside and ready to work at 8 o'clock would be discharged.  Ten employees remained, and the rest of the men on the day shift failed to report for work at the time specified.  Their discharges were later processed by the company.  There being an insufficient number of workers to carry on operations, the 10 who remained on the job were sent home at 9 a.m.

Following the occurrences, above mentioned, the plant remained closed until November 18, 1952.  The plaintiffs in the present proceeding, 8 in number, were among those who left the plant and refused to work on October 24th.  On November 5th the company offered to reinstate all of the men except Buckingham and to arbitrate the dispute with him, but the employees declined the offer.  In accordance with the contract between the union and the employer, above referred to, a claim of grievance was filed with the plant manager, in Buckingham's behalf, approximately 20 minutes after the discharge

At some time subsequent to the events of October 24, 1952, the plaintiffs herein filed claims for unem-

ployment benefits under the Michigan employment security act.* The employment security commission considered such claims and determined in the first instance that the unemployment was due to a stoppage of work caused by a labor dispute. Such determination was protested by the employer as to each plaintiff and subsequently, under date of December 12, 1952, the commission issued a further determination that the claimants were disqualified from October 24, 1952, through the duration of their unemployment, under the provisions of section 29(1)(a)(2) of the act, for misconduct connected with their work. This action was protested by plaintiffs, and on December 22, 1952, the commission issued a redetermination holding plaintiffs disqualified for benefits from October 24, 1952, through the duration of their unemployment, under the provisions of the statute above cited, for misconduct in connection with their work, and cancelling certain credits earned prior to October 24, 1952. On appeal to a referee of the commission the decision was affirmed. Similar action was taken by the appeal board, and the order of the latter board was sustained by the circuit court of Ingham county. The controversy now comes before this Court on appeal from the judgment entered in the circuit court.

The contract, above mentioned, between the Precision Manufacturing Company and the International Union, United Automobile, Aircraft, and Agricultural Implement Workers of America CIO, Local 56, hereinafter referred to as the union, provided that said union should be the sole and exclusive bargaining agent for all employees of the plant at West Branch. It outlined the procedure that should be observed in handling grievances, covered in detail

---

* PA 1936 (Ex Sess), No 1, as amended (CL 1948 and CLS 1952, § 421.1 et seq. [Stat Ann 1950 Rev and Stat Ann 1953 Cum Supp § 17.501 et seq.]).

the matter of seniority rights, and set forth rules designed to protect both employer and employees. Attached to the agreement was a statement of rules of conduct prescribed by the employer. In the article relating to grievance procedure it was specifically provided, in article 3, § 4, that:

"Sec. 4. The union agrees that during the term of the agreement it will not cause or permit or take part in any sit-down, slow-down, or other curtailment of work, strike or picket the company's plant or premises until the grievance procedure provided herein has been completely exhausted. The company agrees that it will not institute any lockout, move work, tools, jigs, fixtures, machinery or other equipment until the grievance procedure has been exhausted."

That the dispute between the employer and Buckingham was subject to the grievance provisions of the contract is not open to question. It appears, however, that the plaintiffs in this case, and some of their fellow employees, were unwilling to abide by the terms of the agreement between the union, their sole bargaining agent, and the employer. It is a fair inference that their attitude was, in part, inspired by the statements made to them by Buckingham, who was at the time the president of the local union. It appears from the record that they refused to work because Buckingham had been discharged, and that they left the employer's plant "to find out what was what."

In enacting the statute granting unemployment benefits the legislature prescribed the terms and conditions under which such benefits might be received, providing that in certain instances they should be withheld or curtailed. Insofar as the present controversy is concerned, the following provisions of section 29 of the employment security act (CLS 1952,

§ 421.29 [Stat Ann 1953 Cum Supp § 17.531]) indicate the legislative intent:

"(1) An individual shall be disqualified for benefits:

"(a) For the duration of his unemployment in all cases where the individual has: (1) left his work voluntarily without good cause attributable to the employer or employing unit, or (2) has been discharged for misconduct connected with his work or for intoxication while at work, or (3) has failed without good cause to apply for available suitable work when so directed by the employment office or the commission or to accept suitable work when offered him, or to return to his customary self-employment, if any, when so directed by the employment office or the commission. * * *

"(b) For any week with respect to which his total or partial unemployment is due to a stoppage of work existing because of a labor dispute in the establishment in which he is or was last employed."

The specific question presented to this Court on the appeal is whether, on the record before us, the plaintiffs' rights to the benefits claimed by them are subject to section 29(1)(a)(2), imposing a disqualification as to benefits for the duration of their unemployment, or to section 29(1)(b), limiting such disqualification to the weeks when there was a stoppage of work. Appellants contend that the latter provision governs and assert in support of their position that there was a "labor dispute" that resulted in the cessation of operations in the employer's plant for the period above mentioned. No claim is made that plaintiffs did not violate the contract between the union and the employer, but it is insisted that there was on their part no "misconduct" within the meaning of the statutory provision above quoted.

In considering the question it must be borne in mind that the burden of proving their eligibility to

benefits rests on the plaintiffs. *Phillips* v. *Unemployment Compensation Commission,* 323 Mich 188; *Clapp* v. *Unemployment Compensation Commission,* 325 Mich 212. It is likewise true, as pointed out in *Intertown Corporation* v. *Unemployment Compensation Commission,* 328 Mich 363, that this Court is limited to a review of the circuit court judgment. In determining the issue presented to him on certiorari the circuit judge was subject to the provisions of section 38 of the employment security act (CLS 1952, § 421.38 [Stat Ann 1953 Cum Supp § 17.-540]), which reads, in part, as follows:

"The findings of fact made by the appeal board acting within its powers if supported by the great weight of the evidence, shall, in the absence of fraud, be conclusive, but the circuit court of the county, in which the claimant resides or in which the employer's principal place of business in Michigan is located, if no claimant is a party to the case, or the circuit court for the county of Ingham shall have power to review questions of fact and law on the record made before the referee and the appeal board involved in any such final decision, but said court may reverse such decision of said appeal board upon a question of fact only if it finds that said decision of the appeal board is contrary to the great weight of the evidence."

May it be said in the instant case that the conclusions of the employment security commission, the referee, and the appeal board, to the effect that the plaintiffs were properly discharged because of misconduct connected with their work were repugnant to the great weight of the evidence? In his findings of fact the referee who heard the appeal from the commission discussed the events connected with the plaintiffs leaving their work, and also the provisions of the contract between the union and the employer, pointing out that said contract made provision for

.the processing of any grievances filed. He also called .attention to the claim of the plaintiffs that they left work because they wanted to determine at once why Buckingham had been discharged. Based on the· undisputed facts the referee concluded that such action on the part of plaintiffs was not only unnecessary but was in direct violation of the contract. He accordingly affirmed the redetermination of the commission. The appeal board accepted the findings of the referee. The circuit judge, after considering the matter fully, came to the conclusion that the holding that plaintiffs had been guilty of misconduct within the meaning of section 29(1)(a)(2) of the employment security act was correct. Under the undisputed facts, and the legitimate inferences that may be drawn therefrom, it may not be said that the decision of the appeal board was contrary to the "great weight of the evidence." ·

Plaintiffs have called attention to *Lawrence Baking Co.* v. *Unemployment Compensation Commission,* 308 Mich 198 (154 ALR 660), in which the appeal board of the commission awarded benefits to employees who engaged in a strike involving hours of work, wages, seniority, and other conditions of employment. There was, however, no stoppage of work in the employer's establishment, and it was accordingly held that there was no disqualification under the statute. ·The situation is not analogous in any respect to the case at bar. Reliance is also placed by appellants on *Intertown Corporation* v. *Unemployment Compensation Commission, supra.* There the commission, the referee, the appeal board, and the circuit court determined that there was no disqualification under ·the statute. The work stoppage resulting from a ·strike in which plaintiffs took part existed for less than 1 hour. No question was raised before the commission, the referee, or the appeal board with· ·reference to a disqualification under section 29(1)|

(a)(2). In seeking review in the circuit court by certiorari, reference was made to said provision of the statute, but the trial judge did not pass thereon and this Court declined to do so. The case did not involve any issue presented here.

The nature of acts that may properly be considered as "misconduct" within the meaning of statutes providing for unemployment benefits has been considered by a number of courts in other States. Based on the conclusions reached the following statement as to the meaning of the term is set forth in 48 Am Jur, Social Security, Unemployment Insurance, and Retirement Funds, § 38, pp 541, 542:

"Misconduct within the meaning of an unemployment compensation act excluding from its benefits an employee discharged for misconduct must be an act of wanton or wilful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has the right to expect of his employee, or negligence in such degree or recurrence as to manifest culpability, wrongful intent, or evil design, or show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer." •

In *Boynton Cab Company* v. *Neubeck,* 237 Wis 249 (296 NW 636), the industrial commission of the State allowed unemployment benefits to a taxicab driver who had been discharged for various violations of company rules. The award was affirmed by the circuit court to which it was appealed, and the supreme court of the State upheld the judgment entered. In reaching its conclusion the court held that the conduct on the part of the employee was not such as to indicate a lack of proper regard for the employer's interest but, rather, resulted from inefficiency and a failure to exercise proper judgment and

discretion. After discussing prior cases, it was said (pp 259, 260):

"The application of these principles leads to the conclusion, in view of the matters to be taken into consideration, as stated above, that the intended meaning of the term 'misconduct,' as used in section 108.04(4) (a), Stats,* is limited to conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligences in isolated instances, or good-faith errors in judgment or discretion are not to be deemed 'misconduct' within the meaning of the statute."

In *Checker Cab Company* v. *Industrial Commission*, 242 Wis 429 (8 NW2d 286), the trial court set aside a decision of the industrial commission to the effect that an employee cab driver was not guilty of misconduct justifying his discharge. Reviewing the record it was concluded that the judgment of the trial court was correct, and that the employee had been guilty of misconduct within the meaning of the statute as interpreted in the *Boynton Cab Company Case, supra.* The opinion of the court, written by Chief Justice Rosenberry, implies that the employee was not only careless and incompetent but also acted in intentional disregard of the employer's interests.

---

* Reference is to Wisconsin Stats 1941. This provision is now found in Wisconsin Stats 1953, § 108.04(5) (a).—REPORTER.

The superior court of Pennsylvania in *Detterer Unemployment Compensation Case,* 168 Pa Super 291 (77 A2d 886), sustained the finding of the unemployment compensation board of review which affirmed a decision of the referee disallowing a claim for unemployment benefits. The proofs indicated that the employee was dissatisfied with his employment, repeatedly complained, and stated in effect that he had forced his own discharge. It further appeared that on occasions he had failed to comply with the instructions of his superintendent. The court agreed with the claim that the employee's actions were deliberate and intentional and showed such disregard of the standards of behavior which the employer had the right to expect as to constitute wilful misconduct within the meaning of the Pennsylvania statute. The court further pointed out that the findings of the board of review, being supported by substantial competent evidence, were binding on the court. The *Detterer Case* was followed in *Moorefield Unemployment Compensation Case,* 169 Pa Super 481 (82 A2d 501).

In *Muldoon Unemployment Compensation Case,* 170 Pa Super 625 (90 A2d 599), the facts were analogous to those in the case at bar. There a contract existed between the employer and the union of which the employees involved were members, which provided, as in the instant case, that there should be no lockout, strike, slowdown or refusal to work on the part of any driver-employee of the company. Said contract also provided for the orderly determination of questions bearing upon conditions of employment or disciplinary measures, and for the submission of disputes to arbitration in certain instances The board of review awarded compensation to employees who had deliberately acted to bring about a work stoppage and who had induced other employees to strike. The court reversed the award, holding the

compensation claimants guilty of wilful misconduct involving a breach of duty to their employer. In this case, unlike the factual situation in the case at bar, the claimants had or claimed to have some grievance against the employer. Nonetheless the attempt to foment trouble was held misconduct within the meaning of the unemployment compensation law.

In *Kern Unemployment Compensation Case,* 172 Pa Super 324 (94 A2d 82), the only labor dispute existing was between the employer and an employee who had been discharged, the propriety of such discharge being in dispute before a grievance committee. However, other employees, including the claimants for unemployment benefits, walked out of the plant in protest of their fellow employee's discharge. Attempts to induce them to return to work failed. The board of review took the position that a labor dispute existed, and that what occurred were acts normally incident to such a dispute during a period of work stoppage. The court rejected such conclusion as being in total disregard of the facts, pointing out that the only labor dispute was between the employer and the employee who was discharged. It was declared that the making of the grievance of the discharged employee their own did not relieve claimants from the consequences of their wilful misconduct which involved flagrant violations of their duty to the employer. The following excerpt from the opinion of the court fairly indicates the situation that was found to exist (p 328):

"The union in its contract with the company, in exchange for other machinery set up by the contract for the settlement of disputes, agreed that it would not permit its members to engage in any walkout or strike during the term of the contract. This agreement made by the union as the agent of the claimants, was binding upon them. Nevertheless they not only participated in the strike on January 30, 1951, but

on February 1 carried signs identifying themselves as pickets, and joined others who were then picketing the main gate through which employees of the company would have to pass to return to work and thus interfered with production in the defendant's plant. Their obvious purpose as pickets was to dissuade defendant's employees from returning to work until they, by means of the walkout, had forced the defendant to reinstate Bamrick, the discharged shipping clerk, although the merits of the company's action as to him was then before the grievance committee in strict compliance with the contract. This misconduct of the claimants in assuming the role of pickets was connected with their work and was voluntary and *willful*. All of the claimants therefore were barred from unemployment compensation on that account."

A situation very similar to that in the *Kern Case, supra,* was involved in *Weimer Unemployment Compensation Case,* 176 Pa Super 348 (107 A2d 607). There 2 fellow employees of the claimants were suspended for violating a rule of the company. Thereupon other employees, including those seeking unemployment benefits in the case, quit work, and were subsequently discharged by the employer. As in the case at bar, a contract was in force and effect between the employer and the union to which the claimants belonged. In sustaining the finding of the compensation board of review that claimants were disqualified for benefits, it was said (p 353):

"The suspension of Dormish and Baker did not concern claimants, and the work stoppage which they brought about was not predicated upon any grievance they had with the company. Moreover, the collective bargaining agreement provided procedures for the settlement of any grievances; these procedures were ignored. The absence of a 'no strike' clause or 'guarantee' clause in the agreement does not mean that claimants by their action in this case did not

breach the agreement with the company. On the contrary, the action of claimants in remaining away from work, when they had no grievance or dispute concerning their conditions of employment, was a clear violation of their agreement, and they were guilty of willful misconduct under the provision of section 402 (e) of the law.*"

In accord with the foregoing cases the appellate court of Indiana in *Merkle* v. *Review Board of the Indiana Employment Security Division,* 120 Ind App 108 (90 NE2d 524), held that an employee who was a "chronic absentee without notice and without permission" was guilty of misconduct within the meaning of the Indiana statute. In sustaining the decision of the board of review it was recognized that to constitute misconduct the acts of the employee must evidence a wanton or wilful disregard for the employer's interests, a deliberate violation of rules, or a wrongful intent.

In some cases in which the question has arisen it has been held, under the facts involved, that the employee seeking unemployment benefits was not guilty of misconduct barring his rights under the pertinent statute. Thus in *M. F. A. Milling Company* v. *Unemployment Compensation Commission,* 350 Mo 1102 (169 SW2d 929, 146 ALR 239), the judgment of the trial court sustaining an award by the unemployment compensation commission was affirmed. The sole question at issue was whether the action of the employee in bringing suit against the employer to recover wages that he in good faith claimed were due him amounted to misconduct. The question was determined against the employer. It was specifically found by the referee that the action was brought in good faith and not for the purpose of harrassing the employer. Somewhat comparable is the holding of the Idaho court in *Mandes* v. *Employ-*

---

* 43 Purdon's Pa Stat Ann, § 802 (e).—Reporter.

*ment Security Agency,* 74 Idaho 23 (255 P2d 1049). There it was held by a majority of the court that an employee who was afflicted with silicosis was not guilty of misconduct barring his right to unemployment benefits.  The employee's refusal to operate a hoist in the employer's mine did not result in any disruption of work, and the majority of the court, 2 members dissenting, were apparently impressed that the employee's claim that he had acted in good faith for the purpose of protecting his health was well-founded.

Counsel for plaintiff cite and rely on *T. R. Miller Mill Company, Inc.,* v. *Johns,* 261 Ala 615 (75 So2d 675), decided by the supreme court of Alabama on November 4, 1954.  There the judgment of the court of appeals (37 Ala App 477 [75 So2d 670]) upholding an award of unemployment compensation benefits was affirmed.  Certain employees had been on strike and when they sought to return to work found that their places had been filled by others.  It was determined as a matter of fact that the strike resulted from a labor dispute between claimants and their employer, and that said plaintiffs had not left their work voluntarily without good cause connected with such work.  The case involved specific provisions of the Alabama statute, and obviously the factual situation is not comparable to that in the instant proceeding before us.

As before pointed out, plaintiffs did not claim that they had grievances against the employer. Rather, as in some of the cases above cited, they made Buckingham's alleged grievance their own.  It is a fair inference that in refusing to work and thereby forcing a shutdown of operations in the employer's plant they were seeking to compel the employer to reinstate their fellow worker.  No other conclusion is tenable.  Insofar as plaintiffs were concerned there was no labor dispute affecting them.  Their

action, taken for the purpose of aiding Buckingham, not only constituted a breach of the contract between the union and the company but was also designed to harrass the employer, to interfere with the conduct of its business, and was in derogation of the standards of conduct that said employer was entitled to expect from them.

Under the definition of "misconduct" recognized by other courts, the conclusion clearly follows that plaintiffs were guilty thereof within the meaning of the term as used in the Michigan employment security act. The legislature has prescribed the terms and conditions under which unemployment benefits may be received and has imposed conditions with which plaintiffs have not complied. The right to benefits rests wholly on the statute. Plaintiffs have barred themselves from receiving what they might have obtained had they refrained from indulging in conduct designed to be prejudicial to the rights of their employer. Such conduct, constituting a violation of the contract as well as being in derogation of rights and obligations pertaining to the employer-employee relation, was deliberate and intentional. The statutory provisions pertinent to the case must be construed and applied in accordance with the obvious legislative intent.

The judgment of the trial court is affirmed. The case involving the interpretation and application of statutory provisions of general interest, no costs are allowed.

BUTZEL, SHARPE, BOYLES, REID, DETHMERS, and KELLY, JJ., concurred with CARR, C. J.