## KEITH v CHRYSLER CORPORATION

### Decision of the Court

1. APPEAL AND ERROR—EQUALLY DIVIDED COURT.

   Decision of the Michigan Court of Appeals affirming denial of unemployment compensation benefits is affirmed by an equally divided Court.

### Opinion for Affirmance

T. E. Brennan, Swainson, and M. S. Coleman, JJ.

2. UNEMPLOYMENT COMPENSATION—NOTICE—EMPLOYMENT INTERVIEW.

   *Under the Michigan Employment Security Act there is an obligation on the part of the employer and employee to take those steps considered necessary by the Legislature to help alleviate the burden of involuntary unemployment and one of these steps places upon the unemployed individual the obligation to attend interviews concerning available suitable work; if the claimant fails to attend such an interview, he shall be "disqualified for benefits" in all cases in which he has failed without good cause to report to his former employer within a reasonable time after notice from said employer for an interview concerning available suitable work with the former employer (MCLA 421.1 et seq.).*

3. UNEMPLOYMENT COMPENSATION—REASONABLE TIME—EMPLOYMENT INTERVIEW—NOTICE.

   *Plaintiff was provided a reasonable time to report for an employment interview under the Michigan Employment Security Act which provides, in part, that a claimant is disqualified for benefits if he "[b]eing unemployed has failed without good cause to report to his former employer within a reasonable time after notice from said employer for an interview concerning available suitable work with said former employer" where the employer did not file its Notice of Possible Disqualification.*

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 5 Am Jur 2d, Appeal and Error § 902.

[2–45] No references.

until 2-1/2 months after notice to appear for an interview (1965 PA 281, § 29).

4. UNEMPLOYMENT COMPENSATION—STATUTES—NOTICE—EMPLOYMENT INTERVIEW.

The purpose of the section of the Michigan Employment Security Act which provides in part that if the claimant failed without good cause to report to his former employer within a reasonable time after notice from that employer for an interview concerning available suitable work with the former employer then he shall be disqualified for benefits, is to bring unemployed individuals and their former employers together to discuss the jobs then available; it does not address itself to the acceptance or rejection of proffered employment, but its scope is restricted to that preliminary step by which the employer can acquaint the unemployed individual with the existing employment possibilities (1965 PA 281, § 29).

5. UNEMPLOYMENT COMPENSATION—EMPLOYMENT INTERVIEW—REFUSAL—GOOD CAUSE.

To find a good-cause refusal to attend an employment interview to prevent disqualification for benefits under the Employment Security Act, the facts must warrant the conclusion that there were significant reasons for not attending; some significant reasons might be an unreasonable distant place of interview, personal illness or emergency making attendance unduly burdensome, or a demonstrated lack of good faith on the part of the employer such as total disregard for the convenience of the claimant or a clearly unacceptable job as the basis for the employment interview.

6. UNEMPLOYMENT COMPENSATION—EMPLOYMENT INTERVIEW—REFUSAL—GOOD CAUSE.

There was no good cause for failing to attend an employment interview with a former employer within the meaning of the Employment Security Act where the interview was to be held within a reasonable distance from the unemployed claimant's residence, the time for the interview was flexible, the claimant made no claim of personal inability to attend, and the basis of his inaction was dislike for assembly work and his desire not to lose his status at another plant.

7. UNEMPLOYMENT COMPENSATION—SUITABLE WORK—NOTICE—EMPLOYMENT INTERVIEW.

The level of inquiry into suitable work under a subsection of the Employment Security Act providing that a claimant shall be

*disqualified for benefits where he fails without good cause to report to his former employer after notice for an interview concerning available suitable work with the employer is different from that under another subsection providing that he shall be disqualified for benefits when he fails without good cause to accept suitable work when offered him; determining the suitability of the proffered employment under the latter subsection should be a very careful and specific task, taking into account each factor of another subsection which provides that in determining whether or not any work is suitable, the commission shall consider the degree of risk involved to the claimant's health, safety, and morals, his physical fitness and prior training, his experience and prior earnings, his length of unemployment and prospects for securing local work in his customary occupation, and the distance of the available work from his residence; the establishment of suitable work under the subsection concerning failure without good cause to report for an interview does not demand the specificity and indepth inquiry of the subsection on failure to accept suitable work; when a claimant refuses to attend an interview, and bases his refusal on the unsuitability of the work that would probably be offered to him, the employer need only demonstrate that the probable employment meets in a general manner the requirements of the subsection on determining whether or not any work is suitable (1965 PA 281, §§ 29[1][d], 29[1][e], 29[6]).*

OPINION FOR REVERSAL

T. M. KAVANAGH, C. J., and T. G. KAVANAGH and WILLIAMS, JJ.

8. UNEMPLOYMENT COMPENSATION—EMPLOYMENT SECURITY APPEAL BOARD—FINDINGS OF FACT—APPEAL AND ERROR—EVIDENCE.

*Generally factual findings of the Michigan Employment Security Appeal Board are conclusive on review, unless not supported by competent, material, and substantial evidence (Const 1963, art 6, § 28; MCLA 421.38).*

9. UNEMPLOYMENT COMPENSATION—EMPLOYMENT SECURITY APPEAL BOARD—QUESTION OF LAW—SUITABLE WORK.

*The Michigan Employment Security Appeal Board's reaching factual conclusions regarding a claim for unemployment compensation benefits on the basis of an analogy to a decision of the Michigan Court of Appeals and not on the basis of an independent examination of each of the statutory factors bearing on disqualification raises a question of law; each case, under*

*a section of a statute providing for determining whether or not any work is suitable for an individual, must be adjudicated by the merits of its own particular facts vis-a-vis each of the statutory tests (MCLA 421.29[6]).*

10. UNEMPLOYMENT COMPENSATION—UNSKILLED OCCUPATION—SUITABLE WORK.

*The Michigan Court of Appeals decision which held that a claimant was disqualified from benefits under the Michigan Employment Security Act is disapproved to the extent that it makes the improper generalization that one unskilled job is ipso facto a "suitable" substitute for purposes of the unemployment compensation statute, for another unskilled job, without considering adequately the pay differential between the two jobs, or the statutory tests such as "length of unemployment" and the time the proffered job was refused (MCLA 421.29[6]).*

11. UNEMPLOYMENT COMPENSATION—DISQUALIFICATION FOR BENEFITS —GOOD CAUSE.

*The phrase "good cause" in the section of the Michigan Employment Security Act providing when an individual shall be disqualified for unemployment compensation benefits, while not a subjective standard, may very well be personal; there are two standards limiting personal "good cause", the first being it is "good cause" when the claimant's reason for such rejection would be deemed by reasonable men and women valid and not indicative of an unwillingness to work and the second standard goes to the "suitability" of the work (MCLA 421.29[1][d], 421.29[6]).*

12. UNEMPLOYMENT COMPENSATION—DISQUALIFICATION FOR BENEFITS —REASONABLE TIME—NOTICE—WORK INTERVIEW—SUITABLE WORK.

*The section of the Michigan Employment Security Act providing when an individual shall be disqualified for unemployment compensation benefits entitles a claimant for unemployment benefits to "a reasonable time" after notice from the employer to report for an interview concerning available suitable work, thus, the timing of a refusal to attend an interview interrelates with the suitability of the work offered; if the unemployed worker is to be afforded an opportunity to search for work at his previous level, utilizing his highest skills at wages commensurate with earlier earnings, then time must be allowed for that search (MCLA 421.29[1][d]).*

13. UNEMPLOYMENT COMPENSATION—DISQUALIFICATION FOR BENEFITS —SUITABLE WORK —REASONABLE TIME—RECALL RIGHTS—DISTANCE.

*Work of substantially less desirability than the work preceding unemployment should not be deemed "suitable" under the section of the Michigan Employment Security Act providing when an individual shall be disqualified for unemployment compensation benefits unless a claimant has been given a reasonable time to compete in the labor market for available jobs for which he has the skill, and which do not create a hardship in terms of such considerations as distance; thus, while one purpose of the Act is to enable the unemployed worker to maintain his work level if possible, since loss of skills results in economic waste, the time that a worker may be allowed to find "suitable" work is limited (MCLA 421.29[1][d], 421.29[6]).*

14. UNEMPLOYMENT COMPENSATION—DISQUALIFICATION FOR BENEFITS —REASONABLE TIME—SUITABLE WORK—QUESTION OF FACT.

*What is a reasonable time for an unemployed worker to find suitable work at his previous level under the section of the Michigan Employment Security Act providing when an individual shall be disqualified for unemployment benefits must be determined as a question of fact under the circumstances of each individual case (MCLA 421.29[1][d]).*

15. UNEMPLOYMENT COMPENSATION—DISQUALIFICATION FOR BENEFITS —EMPLOYMENT SECURITY APPEAL BOARD—REASONABLE TIME—UNSKILLED OCCUPATION—LAYOFF—SUITABLE WORK.

*The Michigan Employment Security Appeal Board totally failed to consider "reasonable time" for an unemployed worker to find suitable work at his previous level in adjudicating the unemployed worker's disqualification for benefits under the Michigan Employment Security Act where it relied on the erroneous rule in a decision of the Michigan Court of Appeals that a claimant in an unskilled occupation should accept work when offered at the time of his layoff where the offer is for work which is suitable in all other respects, since no consideration was given as to what would be a "reasonable time" under the circumstances, there was no consideration as to whether there was a "suitable" job available at the culmination of that "reasonable time"; therefore, if the unemployed worker was disqualified for benefits for failure to accept a job offer made immediately upon his layoff, then he was improperly penalized for having assayed, unsuccessfully, to locate more desirable employment (MCLA 421.29[1][d], 421.29[6]).*

16. UNEMPLOYMENT COMPENSATION—DISQUALIFICATION FOR BENEFITS
—REASONABLE TIME—STATUTES—MALINGERING.

*"[R]easonable time" under the section of the Michigan Employment Security Act providing when an individual shall be disqualified for unemployment benefits is not a license to malinger in the search for work (MCLA 421.29[1][d]).*

17. UNEMPLOYMENT COMPENSATION—DISQUALIFICATION FOR BENEFITS
—EMPLOYMENT SECURITY APPEAL BOARD—CUSTOMARY WORK—
HEALTH—SAFETY—MORALS—PHYSICAL CAPACITY—DISTANCE—
STANDARDS—SUITABLE WORK.

*The Michigan Employment Security Appeal Board's failure to consider whether other jobs were available in an unemployed worker's customary work, not threatening to his health, safety, or morals, nor beyond his physical capability, and within a reasonable distance from his home, because the "claimant * * * has not raised any objections as to [these suitability factors]" is based on erroneous reasoning; the Michigan Employment Security Act does not leave to speculation the tests to be applied in determining the "suitability" of work and specific standards are set out in the Act; the fact that a claimant does not document more explicitly his objections to the proffered work, does not render him disqualified from benefits, in the absence of more thorough investigation by the board (MCLA 421.29[6]).*

18. UNEMPLOYMENT COMPENSATION—DISQUALIFICATION FOR BENEFITS
—BURDEN OF PROOF—EMPLOYMENT SECURITY APPEAL BOARD—
SUITABLE WORK.

*The burden of proving an unemployed worker's disqualification for unemployment compensation benefits is specifically assigned by the Michigan Employment Security Act to the Michigan Employment Security Appeal Board, and under the Act, the fact-finding of the Appeal Board is guided by standards setting out what it "shall consider" in ascertaining the suitability of substitute work for purposes of disqualification (MCLA 421.29[6]).*

19. UNEMPLOYMENT COMPENSATION—EMPLOYMENT SECURITY APPEAL
BOARD—ADMINISTRATIVE LAW—EVIDENCE—FINDINGS OF FACT—
WITNESSES.

*A hearing before the Michigan Employment Security Appeal Board is not truly an adversary proceeding; in an administrative proceeding the claimant need not secure the representation of counsel, as the board itself is charged with investigation as well as adjudication of claims properly presented to it, there-*

fore, even if the evidence submitted by the claimant is insufficient to establish all pertinent facts, the burden is on the Appeal Board to further investigate whatever evidence is necessary to make informed findings of fact; to that end, the board is empowered to subpoena witnesses other than those furnished by the claimant or the employer (MCLA 421.9).

20. UNEMPLOYMENT COMPENSATION—EMPLOYMENT SECURITY APPEAL BOARD—SUITABLE WORK—DISQUALIFICATION FOR BENEFITS—WORK INTERVIEW.

The Michigan Employment Security Appeal Board, on the basis of its limited investigation of the factors bearing on the suitability of the work proffered an unemployed factory worker, was not warranted in disqualifying the worker from benefits solely because he refused to attend a work interview at another factory that he was referred to the day he was laid off.

21. UNEMPLOYMENT COMPENSATION—DISQUALIFICATION FOR BENEFITS —DISTANCE OF AVAILABLE WORK—SUITABLE WORK.

"Distance of available work" as stated in a section of the Michigan Employment Security Act providing when an individual shall be disqualified for unemployment compensation benefits varies inversely with increasing time; at the time of initial unemployment, and for a reasonable time immediately thereafter, a worker should be able to restrict his search for available "suitable" work to his home locality and yet continue to qualify for benefits, but as weeks pass, it becomes increasingly incumbent upon the claimant to seek work beyond his immediate community.

22. UNEMPLOYMENT COMPENSATION—EVIDENCE—LAYOFF—RECALL TO WORK.

Evidence that an unemployed worker has been laid off temporarily is one consideration to be weighed in each case to determine if the worker is entitled to unemployment compensation benefits; a worker who is laid off for an annual model change requiring a few weeks, and has good prospects of recall, is more justified in refusing to accept work involving extensive commuting to another locality, than is a claimant whose prior work has been permanently terminated, or whose work is strictly seasonal.

23. UNEMPLOYMENT COMPENSATION—DISTANCE FACTOR—DEMAND FOR LABOR.

The distance factor, to determine if an unemployed worker is entitled to unemployment compensation benefits, varies in-

*versely with the demand for labor; thus, if there is a labor shortage in a community within a reasonable distance, and an obvious surplus of labor in the locality where the worker has been employed and lives the claimant may be expected in a shorter time to seek work where it exists.*

24. UNEMPLOYMENT COMPENSATION—LAYOFF—RECALL TO WORK— FINDINGS OF FACT—EMPLOYMENT SECURITY APPEAL BOARD.

*The temporariness of an unemployed worker's layoff should be taken into consideration in determining how far the worker should search for new employment before being entitled to unemployment compensation benefits; whether recall was sufficiently imminent to warrant an unemployed worker's decision to limit his search for work to the city he lived in, if in fact that is what he did, is a question for fact-finding by the Michigan Employment Security Appeal Board.*

25. UNEMPLOYMENT COMPENSATION—SUITABLE WORK—CUSTOMARY OCCUPATION.

*An important factor in determining an unemployed worker's "suitability" for available work when determining if he is qualified for unemployment compensation benefits is the claimant's present expectancy of obtaining other employment similar to his customary occupation; an offer of employment is not "suitable" if it requires a worker who still has fair prospects of securing work in his customary occupation to step down to work of substantially less desirability or grade before he has had a reasonable chance to look for work in his own line.*

26. UNEMPLOYMENT COMPENSATION—SKILLED WORK—TRAINING—EXPERIENCE.

*The preservation of worker skills and utilization of full training and experience should be important factors in administering the Michigan Employment Security Act (MCLA 421.1 et seq.).*

27. UNEMPLOYMENT COMPENSATION—OCCUPATIONAL CHOICE.

*An individual seeking unemployment compensation benefits has a right to an occupational choice as long as he does not reduce his prospects of employment to such an extent that he no longer has any opportunity to secure work, and, in effect, removes himself from the labor market.*

28. UNEMPLOYMENT COMPENSATION—CUSTOMARY WORK—SIMILAR WORK—REASONABLE TIME—SUITABLE WORK.

*Customary work may be the only work that is "suitable" for an unemployment compensation benefits claimant at the outset of unemployment but, as joblessness continues, the scope of cus-*

tomary work expands to other related, "similar jobs"; similar work must refer to job content and work conditions, and not until the length of unemployment has been substantial and the claimant has been allowed "a reasonable time" to find work within his limitations, may work of substantially lesser grade or entirely different nature be deemed "suitable".

29. UNEMPLOYMENT COMPENSATION—UNSKILLED WORK—SKILLED WORK.

There may be lower and higher grades of unskilled work as well as of skilled work, some jobs are less desirable than others, and distinctions in kind of work may be based upon size of establishment, tools, processes, and materials used or customers served and the degree of skill, experience, knowledge, responsibility, and training involved in the work may also serve as criteria of classification; whatever classification bases are used, they must reflect differences among jobs in the performance required of the worker.

30. UNEMPLOYMENT COMPENSATION—EVIDENCE—ASSEMBLY LINE—SUITABLE WORK.

Psychological, economic, and sociological survey evidence from newspapers and magazines regarding the undesirability of working on a main conveyor belt assembly line is highly relevant to distinguishing kinds of work for purposes of adjudicating "suitability" of available work for an unemployed worker, and, therefore, properly may be an area for administrative inquiry and notice.

31. UNEMPLOYMENT COMPENSATION—EVIDENCE—LEGISLATIVE FACTS—GOOD CAUSE—REASONABLE TIME—SUITABLE WORK.

Under the liberal evidentiary rules of the administrative forum, legislative facts are admissible when the agency is developing law or policy—that is, acting legislatively which is the case when ruling on the meaning of "good cause", "a reasonable time" and "suitability" of work; the opportunity to offer rebuttal evidence of the same nature must be available to the employer as well.

32. EVIDENCE—JUDICIAL NOTICE—ASSEMBLY LINE JOBS.

The Michigan Supreme Court may take notice judicially of the fact that assembly line jobs are ranked very low in a number of studies of automobile worker attitudes.

33. UNEMPLOYMENT COMPENSATION—EMPLOYMENT SECURITY APPEAL BOARD—FINDINGS OF FACT—SUITABLE WORK.

The Michigan Employment Security Appeal Board made inade-

quate findings in regard to the "suitability" of assembly line work for an unemployed subassembly worker because its findings of fact fail to reflect the differences between the jobs of line assembly and subassembly machine operation work in terms of the respective job content and the performance required of the worker; in this regard, survey studies of work conditions and attitudes might significantly aid the board in assessing the "suitability" of substitute work which differs from the customary occupation, whether skilled or unskilled, of the unemployed individual.

34. UNEMPLOYMENT COMPENSATION—CUSTOMARY OCCUPATION— LENGTH OF UNEMPLOYMENT.

*A worker, unemployed through no fault of his own, may refuse work offered immediately after separation from his last job which is outside the ambit of his customary occupation or training; such justification for refusal diminishes, however, as the period of unemployment lengthens.*

35. UNEMPLOYMENT COMPENSATION—LENGTH OF UNEMPLOYMENT— QUESTION OF FACT—RECALL TO WORK.

*The length of unemployment that is permissible before unemployment compensation benefits are barred cannot be honed down to a rigid yardstick; it is a fact question which must be determined on the basis of the circumstances involved in each individual case; where there is a reasonably early expectancy of recall to the claimant's prior place of employment, a somewhat longer duration of unmitigated unemployment might be tolerable, leeway might be granted to workers in certain work specialties where the state has a strong interest in maintaining the worker's skill, and moreover, more lenience might be accorded to workers for whom the search for work is particularly difficult.*

36. UNEMPLOYMENT COMPENSATION—CUSTOMARY OCCUPATION— LENGTH OF UNEMPLOYMENT—SUITABLE WORK.

*The length of unemployment in determining whether or not any work is suitable for an unemployed individual is not a penalty provision; it operates to limit the claimant's choice only because the passage of time is an indicator with regard to other statutory factors, such as prospects for securing work in the customary occupation; thus, isolated attention to the length of unemployment alone, and not in the context of all the circumstances of the claim, would normally be improper.*

37. Unemployment Compensation—Wages—Employment Security Appeal Board—Unskilled Occupation—Suitable Work—Length of Unemployment.

*While an unemployment compensation benefits claimant might associate wages with the job he wants, it is improper for the Michigan Employment Security Appeal Board to fall into the pitfall of looking at comparable wages of different unskilled jobs as a measure of the* similarity *of the work; wages bear solely on the* suitability *of work for a particular individual with particular work history and training; a worker may at the outset of unemployment demand a wage in parity with that he has previously received, may even refuse jobs paying lower wages; work at substantially lower wages should not be deemed "suitable" unless the claimant had a reasonable time to seek available jobs for which he has the capability, at a rate of pay commensurate with his prior earnings, but, as the length of unemployment continues, the worker may have to lower his financial sights.*

38. Unemployment Compensation—Employment Security Appeal Board—Findings of Fact—Unskilled Work—Similar Work—Suitable Work—Experience.

*The Michigan Employment Security Appeal Board's finding that an unemployment compensation benefits claimant's prior work record and experience had been in unskilled types of work which he was able to perform after brief training on the job and its conclusion, therefore, that work as an assembler, which was "generally similar in character" was "suitable", relying on a decision of the Michigan Court of Appeals is misplaced; experience means work history and includes not only the description of the work which the claimant has performed in the past, but, further, the degree of skill, strength, knowledge, and responsibility involved in performing that work, and examination of these considerations should bring out whether the difference between the previous and the proffered work is frivolous or significant enough to render the work unsuitable, at least for the early periods of unemployment.*

39. Unemployment Compensation—Employment Security Appeal Board—Prior Training.

*The Michigan Employment Security Appeal Board, in administering the Michigan Employment Security Act, is directed by statute to give consideration to the claimant's prior training (MCLA 421.29[6]).*

40. UNEMPLOYMENT COMPENSATION—PRIOR TRAINING—NEW EMPLOY-
    MENT—TRAINING—EXPERIENCE—RATE OF PAY—UNSKILLED OC-
    CUPATION—SKILLED WORK—LENGTH OF UNEMPLOYMENT.

    *Subject to the exception that a lengthy period of unemployment
    may require a claimant to accept work which does not utilize
    his prior training, an unemployment compensation benefits
    claimant is entitled to a reasonable length of time within which
    to seek employment commensurate with his training and expe-
    rience, with appropriate rate of pay and nothing in the Michi-
    gan Employment Security Act discriminates against the uns-
    killed worker, nor limits consideration of "training" to skilled
    workers alone; even if an unemployed subassembly worker
    could have been trained quickly to perform assembly line work,
    his right to seek work in the occupation for which he had
    training, at his prior level of competence, cannot be diminished,
    any more than the increasing length of unemployment operates
    to diminish that right for any other worker who has put in a
    year on the job.*

41. UNEMPLOYMENT COMPENSATION—EMPLOYMENT SECURITY APPEAL
    BOARD—FINDINGS OF FACT—PHYSICAL FITNESS—LAYOFF.

    *The Michigan Employment Security Appeal Board improperly
    dismissed the need to make a finding regarding an unemployed
    subassembly worker's physical fitness to perform assembly line
    work because he did not object to the proffered assembly line
    work at the time of his layoff on the basis of physical fitness;
    under the statutory command that this is a factor it "shall
    consider", the burden is on the board to go beyond mere
    assumption and elicit sufficient facts on which to base its
    findings.*

42. UNEMPLOYMENT COMPENSATION—DISQUALIFICATION FOR BENEFITS
    —LENGTH OF UNEMPLOYMENT—SUITABLE WORK—PHYSICAL FIT-
    NESS.

    *Regardless of the length of unemployment, work to be "suitable"
    under the section of the Michigan Employment Security Act
    providing when an individual shall be disqualified for unem-
    ployment compensation benefits must be such work as the
    employee is reasonably capable of performing in terms of
    strength, endurance, coordination, psychological stability and
    learning ability; in considering the physical fitness of a claim-
    ant for work, personal restrictions based on physical disability
    or limitations, and the character of the labor proffered is
    relevant as long as it does not unreasonably narrow the field of
    the claimant's availability for work, and prior experience and*

*training are important in weighing physical objections to proffered alternate employment (MCLA 421.29[6]).*

43. UNEMPLOYMENT COMPENSATION—EMPLOYMENT SECURITY APPEAL BOARD—BURDEN OF PROOF—RISK—HEALTH—SAFETY—MORALS —EVIDENCE.

*The Michigan Employment Security Appeal Board - improperly passed off the burden of proof as to the degree of risk involved to an unemployment compensation benefits claimant's health, safety, and morals in accepting a job as an assembly line worker when he previously worked as a subassembly worker, on the basis that the claimant had not presented evidence of any threat to his health, safety, or morals.*

44. UNEMPLOYMENT COMPENSATION—HEALTH—SAFETY—MORALS— SUITABLE WORK—EVIDENCE.

*An unemployment compensation benefits claimant may be justified in refusing on the grounds of unsuitableness a job offer which might impair his health, safety or morals, without being precluded from receiving unemployment compensation benefits, prior medical history of allergies, nervous condition, or weakness is relevant in this regard since the work is "suitable" only if the claimant is capable of performing it; moreover, statistical evidence regarding hazards to the health or safety of laborers generally in the proffered line of work, may be pertinent evidence in support of a claimant's refusal to work on the basis of hazard.*

45. UNEMPLOYMENT COMPENSATION—HEALTH—SAFETY—MORALS— PRIOR TRAINING—SUITABLE WORK.

*While work hazardous to health, safety or morals, for which the unemployment compensation claimant has no prior training, might never be "suitable" substitute employment, merely increased hazard of alternate work would not justify continuance of compensated unemployment over an extended period of time, if the claimant is not actively seeking more suitable work.*

Appeal from Court of Appeals, Division 2, Levin, P. J., and R. B. Burns and J. H. Gillis, JJ., affirming Macomb, Alton H. Noe, J. Submitted June 6, 1973. (No. 7 June Term 1973, Docket No. 54,363.) Decided December 18, 1973. Rehearing denied February 22, 1974.

41 Mich App 708 affirmed by an equally divided Court.

Claim by John Keith against Crysler Corporation for unemployment compensation. Benefits denied. Plaintiff appealed to circuit court. Affirmed. Plaintiff appealed to the Court of Appeals. Affirmed. Plaintiff appeals. Affirmed by an equally divided Court.

*Stephen I. Schlossberg, John A. Fillion,* and *Jordan Rossen,* for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *James H. White,* Assistant Attorney General, for defendant Michigan Employment Security Commission.

*Clifford L. Johnson,* for defendant Chrysler Corporation.

SWAINSON, J. John Keith was hired by Chrysler Corporation at its Detroit Tank Plant located in Warren, Michigan on April 22, 1968. When hired, Keith was 18 years of age and embarking upon his first full-time employment.

Plaintiff Keith was classified as a washer and degreaser and generally worked at that classification for the period prior to his layoff for lack of available work on April 25, 1969. After his layoff, Keith applied for unemployment compensation under the Michigan Employment Security Act. MCLA 421.1 *et seq.;* MSA 17.501 *et seq.* The issue before us concerns Keith's subsequent disqualification to receive benefits by the Michigan Employment Security Appeal Board.

The Appeal Board found that Keith failed to comply with the requirements of § 29(1)(d) of the act by failing, without good cause, to report to his employer for an interview concerning available work at its Hamtramck Assembly Plant. The

Court of Appeals (LEVIN, P. J., dissenting) upheld
the Appeal Board in *Keith v Chrysler Corp,* 41
Mich App 708; 200 NW2d 764 (1972), citing the
case of *Losada v Chrysler Corp,* 24 Mich App 656;
180 NW2d 844 (1970) *leave den* 383 Mich 827
(1970), as controlling. Although we do not adopt
the reasoning of either the Appeal Board or the
Court of Appeals, we find that the correct result
was reached and we therefore affirm the denial of
benefits to plaintiff Keith.

Little need be said at this point in time about
the purpose of the unemployment security act. The
act itself clearly states the Legislature's approach
to the problem of unemployment.

"Sec. 2. Declaration of policy. The legislature acting
in the exercise of the police power of the state declares
that the public policy of the state is as follows: Eco-
nomic insecurity due to unemployment is a serious
menace to the health, morals, and welfare of the people
of this state. Involuntary unemployment is a subject of
general interest and concern which requires action by
the legislature to prevent its spread and to lighten its
burden which so often falls with crushing force upon
the unemployed worker and his family, to the detri-
ment of the welfare of the people of this state. Social
security requires protection against this hazard of our
economic life. Employers should be encouraged to pro-
vide stable employment. The systematic accumulation
of funds during periods of employment to provide bene-
fits for periods of unemployment by the setting aside of
unemployment reserves to be used for the benefit of
persons unemployed through no fault of their own, thus
maintaining purchasing power and limiting the serious
social consequences of relief assistance, is for the public
good, and the general welfare of the people of this
state." MCLA 421.2; MSA 17.502.

Under the act there is an obligation on the part

of the employer and employee to take those steps
considered necessary by the Legislature to help
alleviate the burden of involuntary unemploy-
ment. *Dwyer v Unemployment Compensation
Commission,* 321 Mich 178, 188; 32 NW2d 434
(1948).

One of these steps is found in § 29(1)(d). It places
upon the unemployed individual the obligation to
attend interviews concerning available suitable
work. If the claimant fails to attend such an
interview, he shall be "disqualified for benefits" in
all cases in which he:

"Being unemployed has failed without good cause to
report to his former employer or employing unit within
a reasonable time after notice from said employer or
employing unit for an interview concerning available
suitable work with said former employer or employing
unit, * * * ."[1]

In determining the applicability of § 29(1)(d) to
the facts of the present case, we must address
ourselves to the poignant arguments advanced by
counsel for plaintiff. Plaintiff contends that he is
not subject to sanction under § 29(1)(d) because he
(a) was not given a reasonable time in which to
report for an interview, (b) exhibited a good cause
for not appearing at the interview, and (c) further,
because defendants failed to prove that the work
for which he was to report was suitable within the
definition of § 29(6) of the act.
a. Reasonable Time.

At the time of his layoff Keith was orally refer-
red to the Hamtramck Assembly Plant for an
interview. One week later, on May 2nd, a telegram
was sent by Chrysler asking him to report to the

[1] 1967 PA 254, § 29(1)(d); MCLA 421.29(1)(d); MSA 17.531(1)(d).

Hamtramck Assembly Plant.[2] Claimant did not appear for the interview after either request.

It is often very difficult to establish what is a reasonable time for the purposes of a given statute. However, in the present case, Chrysler did not file its Notice of Possible Disqualification until July 18, fully 2-1/2 months after the second notice to appear for an interview. Under the facts of the instant case, it would be extremely tenuous for us to hold that 2-1/2 months is not a reasonable time in which to appear for an interview. We conclude then, that appellant Keith was provided a reasonable time to report to the Hamtramck Assembly Plant for an employment interview under § 29(1)(d) of the act.

b. Good Cause.

A large part of the argument in this case is addressed to the issue of the merits of Keith's refusal of the proffered assembly work at the Hamtramck Assembly Plant. The majority in the Court of Appeals relied on the *Losada* case which held no good cause present in a situation where an

---

[2] There was some dispute as to the existence and content of the May 2, 1969 telegram. At the hearing before the referee, Keith stated that he did not remember receiving the telegram. A representative of Chrysler Corporation testified that a telegram was sent and the referee and Appeal Board so found as a matter of fact. At oral argument, a copy of the telegram was requested by this Court to which counsel for Chrysler Corporation replied in a letter dated June 19, 1973, that:

"After a diligent search of Chrysler's files, including warehoused 'dead storage' files, the telegram has not been turned up, and we have concluded that we no longer have a copy thereof."

We note, however, that in his brief on appeal Keith acknowledges that the telegram was sent and does not argue that it was not received. There is, then, no basis on which to question the finding of the referee and the Appeal Board. *Compare, Vulcan Forging Co v Employment Security Commission,* 368 Mich 594; 118 NW2d 994 (1962).

If the telegram requesting plaintiff to report for an interview had not been sent and received, we think it is questionable that the termination referral made on April 25, 1969, standing alone, would have constituted a proper notice of interview to plaintiff.

employee refused work in an adjoining plant. In dissent, Judge (now Justice) LEVIN expressed his inability to follow *Losada* and concluded that,

" * * * the term 'good cause' as used in the Employment Security Act means nothing more than good reason—a substantial reason—for refusing to accept the proffered employment, and that a cause personal to the employee can be good cause. I also conclude that on the facts of this case Keith had good cause to refuse the proffered employment."

In our opinion, the debate on the validity of *Losada* and the presence of good cause for refusing assembly work at the Hamtramck Assembly Plant is not material to the facts of this case. The only "good cause" we are concerned with here is Keith's good cause for failing to report for an interview. We do not review the validity of *Losada* nor do we decide if Keith could have exhibited good cause for refusing an assembly job if one had been offered. The facts of this case only justify an examination of the requirements of good cause under § 29(1)(d) for failing to appear for an interview.

Good cause under § 29(1)(d) has not been defined by the Legislature or the courts. In searching for a meaning, we look to what is reasonable in light of the purpose of the disputed section. The obvious purpose of § 29(1)(d) is to bring unemployed individuals and their former employers together to discuss the jobs then available. Section 29(1)(d) does not address itself to the acceptance or rejection of proffered employment; its scope is restricted to that preliminary step by which the employer can acquaint the unemployed individual with the existing employment possibilities.

To find a good-cause refusal to attend an interview, the facts must warrant the conclusion that

there were significant reasons for not attending. Depending upon the facts of the given case, some significant reasons might be an unreasonably distant place of interview, personal illness or emergency making attendance unduly burdensome, or a demonstrated lack of good faith on the part of the employer such as total disregard for the convenience of the claimant or a clearly unacceptable job as the basis for the employment interview.

Examining the facts of this case, we cannot find good cause for failing to attend an interview. The interview was to be held within a reasonable distance from Keith's residence, the time for the interview was flexible, and Keith has made no claim of his personal inability to attend.

The basis of his inaction was dislike for assembly work and his desire not to lose his status at the Tank Plant. We cannot find that in the case of a worker with slightly more than one year's seniority such dislikes and desires establish good cause for failure to merely attend an interview.

c. Suitable Work.

The Appeal Board found in its opinion that the interview was for work generally similar in character which would be suitable under the act. We cannot say that under Const 1963, art 6, § 28 and § 38[3] of the act that the decision of the Appeal Board must be reversed.

Section 29(6) does specifically enumerate factors of inquiry in determining whether or not work is suitable for an individual. There is, however, a difference in the level of inquiry demanded into suitable work under § 29(1)(d) and § 29(1)(e). When an individual has been offered a specific job and thereafter refuses to accept it, determining the suitability of the proffered employment under

[3] MCLA 421.8; MSA 17.540.—Reporter.

§ 29(1)(e) should be a very careful and specific task, taking into account each factor of § 29(6) individually. The establishment of suitable work under § 29(1)(d), however, does not demand the specificity and in-depth inquiry of § 29(1)(e). When a claimant refuses to attend an interview, and bases this refusal on the unsuitability of the work that would probably be offered to him, the employer need only demonstrate that the probable employment meets in a general manner the requirements of § 29(6).[4] *Cf. Michigan Tool Co v Employment Security Commission,* 346 Mich 673, 679–680; 78 NW2d 571 (1956).

Returning again to the facts before us, we conclude that the probable employment that would have been offered at the interview—assembly line work at an increase of pay over claimant's present classification, at a plant within the area, after claimant had been employed at his present job for less than 1-1/2 years and where he had had time to look for local work in his customary employment—generally met the requirements of § 29(6) for the purposes of § 29(1)(d). We emphasize again

[4] In a similar case to the case presently before us, the Delaware Supreme Court confronted a dilemma posed in attempting to judge the suitability of proffered work where the claimant refuses to appear for an interview and learn the nature of such work. *Johnston v Chrysler Corp,* 54 Del 279; 178 A2d 459 (1962). The Delaware Court recognized that where there is an apparent similarity between the claimant's former job and the probable job to be discussed at an interview, claimant must meet a threshold burden of attending the interview if he desires inquiry into the suitability of the specific job that might be offered. The Delaware Court stated:

"We are not dealing in this case with a notice received by a claimant to report for interview sent him by an employer with whom he had no former connection. This notice was sent by his last employer required by contract to rehire him before any nonformer employee was hired. It might well have resulted that the final offer of a precise job would not have had to be accepted by the claimant because of the exceptions of 19 *Del. C.* § 3315 (3), (A), (B), (C) and (D), but claimant by his flat rejection of Chrysler's notice has precluded inquiry into this." 54 Del 279, 287; 178 A2d 459, 463.

that we deal here only with the threshold inquiry of § 29(1)(d) and not with the more rigorous inquiry demanded under § 29(1)(e). There indeed may be cases in which the probable employment so disregards the factors of § 29(6) as applied to the unemployed individual that it would require a finding that the work was unsuitable even for the purposes of § 29(1)(d); this is not such a case.

The decision of the Court of Appeals is affirmed.

T. E. BRENNAN and M. S. COLEMAN, JJ., concurred with SWAINSON, J.

WILLIAMS, J. The issue in this appeal is the legality of the interpretation by the Michigan Employment Security Appeal Board of the meaning of three terms: first, "good cause"; second, "a reasonable time"; and third, "suitable work", in § 29(1)(d) and § 29(6) of the Michigan Employment Security Act (hereafter MESA), MCLA 421.29; MSA 17.531 which read as follows:

Sec. 29 "(1) An individual shall be disqualified for benefits in all cases in which he:

\* \* \*

"(d) Being unemployed has failed without *good cause* to report to his former employer or employing unit within *a reasonable time* after notice from said employer or employing unit for an interview concerning available *suitable work* with said former employer or employing unit \* \* \* ." (Emphasis added.)

Sec. 29 "(6) In determining whether or not any work is suitable for an individual, the commission shall consider the degree of risk involved to his health, safety and morals, his physical fitness and prior training, his experience and prior earnings, his length of unemployment and prospects for securing local work in his customary occupation, and the distance of the available work from his residence."

Generally factual findings of the Appeal Board are conclusive on review, unless not supported by competent, material, and substantial evidence. MCLA 421.38; MSA 17.540; Const 1963, art 6, § 28. However, here, the Appeal Board premised its factual conclusions on the erroneous legal assumption that the circumstances of Keith's unemployment paralleled the facts in the case of *Losada v Chrysler Corp,* Ingham County Circuit Court No. 6393-C, Appeal Docket No. B60-2859-RM-34538; remanded 376 Mich 209; 135 NW2d 897 (1965); subsequently affirmed by the Court of Appeals, 24 Mich App 656; 180 NW2d 844 (1970), *leave den* 383 Mich 827 (1970), which held that the claimant was disqualified from benefits.

The Appeal Board's reaching factual conclusions regarding Keith's claim on the basis of an analogy to *Losada* and not on the basis of an independent examination of each of the statutory factors bearing on disqualification, set out in MCLA 421.29(6); MSA 17.531(6) raises a question of law. Each case, under § 29(6), must be adjudicated by the merits of its own particular facts vis-a-vis each of the statutory tests. This was pointed out by three Justices in the very case of *Chrysler Corp v Losada,* 376 Mich 209, 213; 135 NW2d 897, 898 (1965) as follows:

"Further, the section sets out in definitive fashion, guidelines to be used in determining suitability. As appears from the statutory quote above [§ 29], certain work is 'deemed' suitable. In determining suitability, otherwise, the commission is required to 'consider' a number of factors."

## I —FACTS

Claimant Keith was first hired by Chrysler Corporation at its Detroit Tank Plant in Warren,

where he lived, on April 22, 1968. Keith was 18 years old and this was his first full-time employment. He worked initially as painter, then as a washer and degreaser machine operator at an hourly rate of $3.33 an hour. He was laid off for a period from January to March, 1969, reemployed, then laid off again on April 25, 1969, due to lack of work.

When Keith was laid off on April 25th, he was referred by his personnel supervisor to Chrysler's Assembly Plant in Hamtramck for an interview. This referral was later verified by telegram on May 2, 1969. Keith did not respond to either referral before he was recalled to the Tank Plant as a washer-degreaser machine operator on August 4th of the same year. Chrysler filed notice of the failure to attend the interview with the Michigan Employment Security Commission (hereinafter MESC) on July 18, 1969, the date that the Hamtramck Plant was closed for model changes.

The Chrysler representative testified before the referee that Keith would probably have been offered an assembly line job at the Hamtramck Plant because that was the nature of the work performed in that division. He opined that "Keith would qualify for the $3.46 rate an hour". He testified further that Keith would retain his seniority but would not have recall rights at the Tank Plant, if he accepted the Hamtramck work, unless he was laid off at the Hamtramck Plant.

While awaiting recall to the Tank Plant, Keith sought, unsuccessfully, alternate employment opportunities as a painter at a "collision place", and at three or four "bump shops" in the neighborhood. He also filled out an application "at Chevrolet" for work as a washer and degreaser machine operator.

Keith applied for unemployment compensation benefits on August 7, 1969. The referee and the claims investigator allowed compensation, finding that Keith had "good cause" to refuse to report to the Hamtramck interview, "[s]ince" to use the claims interviewer's words, "the work available was not the type for which he had experience and training, it is deemed unsuitable".

The Appeal Board reversed the referee and claims investigator. Relying on *Losada v Chrysler Corp, supra,* the Appeal Board found first, that the proffered work was suitable, second, that the claimant should have accepted the work "when offered at the time of his layoff", and third, that the fact that acceptance of the Hamtramck Plant work would bar recall to the Tank Plant was not a valid consideration.

On appeal, the circuit court affirmed the Appeal Board, again citing *Losada.* In turn, the Court of Appeals, in a four-line opinion stated that "This case is controlled by *Losada v Chrysler Corp* * * * ." 41 Mich App 708, 709; 200 NW2d 764, 765 (1972) (LEVIN, P. J., dissenting).

## II —LOSADA

Contrary to the opinion of the Court of Appeals and the determination and redetermination of the Appeal Board, this case is not controlled by *Losada v Chrysler Corp, supra.*

The facts in *Losada* are critically different. Claimant Losada had held several job classifications in the trim department of the Dodge Plant Assembly Division, but at the time of his layoff was classified as a "cutter". He had worked as a welder prior to his employment at Dodge. He refused to accept as alternate employment jobs

located *in the same building,* as a medium press operator, or *as a welder,* for the reason that "it would take him out of trim" work.[1] *Losada, supra,* 24 Mich App 656, 660; 180 NW2d 844, 846. In contrast, the work offered Keith was not at the same plant, but at a more distant one, in a different community, and was not work that could be said to be commensurate with his training and experience, as Keith had never had a main assembly line job, and his previous experience was as a washer and degreaser machine operator and as a painter.

Since *Losada* was *the only and an incorrect basis* for the Court of Appeals decision, further review must be, and is, limited to the Appeal Board decision.

### III —GOOD CAUSE

Keith assigned two reasons as "good cause" for refusing to attend the proffered interview at the Hamtramck Plant in his testimony before the referee:

(1) He had been advised by his union steward that if he accepted the Hamtramck work, he would not be able to return to the Tank Plant in Warren (where he lived) unless he had been laid off at the Hamtramck Plant.

(2) "[He] had no desire to work in assembly work."

---

[1] The decision in *Losada* is disapproved to the extent that it makes the improper generalization that one unskilled job is ipso facto a "suitable" substitute for purposes of the unemployment compensation statute, for another unskilled job, without considering adequately the pay differential between the two jobs, or the statutory tests of MCLA 421.29(6); MSA 17.531(6) such as "length of unemployment" and the time the proffered job was refused (in *Losada,* only two days).

Neither factor was explored by the Appeal Board which dismissed the right to recall argument as an invalid consideration, and improperly characterized the objection to assembly work as a preference, although in fact it met the test of *Ford Motor Co v Unemployment Compensation Commission,* 316 Mich 468, 473; 25 NW2d 586, 588 (1947) which required that the claimant object to "the character of the labor itself". In the *Ford Motor* case, tried on the issue of the "availability" of the claimant for work, the claimant was found ineligible for benefits because her objections to the proffered employment were on the basis of personal preference only (she preferred a day shift job), rather than on the basis of the "character of the labor" itself.

Thus, while "good cause" is not a subjective standard, it may very well be personal, as Justice (then Judge) LEVIN pointed out below.

We adopt Justice (then Judge) LEVIN's standards limiting personal "good cause". His first standard for "good cause" was taken from *In re Watson,* 273 NC 629; 161 SE2d 1 (1968). It is "good cause" "when his [the claimant's] reason for such rejection would be deemed by reasonable men and women valid and not indicative of an unwillingness to work". 41 Mich App 708, 714; 200 NW2d 764, 767 (1972). His second standard goes to the "suitability" of the work. 41 Mich App 708, 715; 200 NW2d 764, 768.

We shall have occasion in discussing "suitability" in this opinion to study that important aspect of "good cause". Actually, while Keith's objection to "assembly work" may be in some sense personal, it also relates generally to "suitability" as both the claims examiner and the referee found.

## IV —REASONABLE TIME

If the unemployed worker is to be afforded an opportunity to search for work at his previous level, utilizing his highest skills at wages commensurate with earlier earnings, then time must be allowed for that search. Section 29(1)(d) of the MESA entitled the claimant to "a reasonable time" after notice from the employer to report for an interview concerning available suitable work. Thus, the timing of a refusal to attend an interview interrelates with the suitability of the work offered.

Work of substantially less desirability than the work preceding unemployment should not be deemed "suitable" unless a claimant has been given a reasonable time to compete in the labor market for available jobs for which he has the skill, and which do not create a hardship in terms of such considerations as physical health, seniority and recall rights, or distance.[2]

Thus, while one purpose of the MESA is to enable the unemployed worker to maintain his work level if possible, since loss of skills results in economic waste, the time that a worker may be allowed to find "suitable" work is limited. The Supreme Judicial Court of Massachusetts in *Pacific Mills v Director of Division of Employment Security,* 322 Mass 345, 350; 77 NE2d 413, 416 (1948), states the limitation as follows:

"Employment which may not be suitable while there

---

[2] For example, the refusal of a skilled-trade worker to accept work as a sweeper, when the work offered was to begin immediately at the termination of his prior job, may be characterized as a "good cause" refusal *(see Dubkowski v Administrator, Unemployment Compensation Act,* 150 Conn 278; 188 A2d 658 [1963]), but a claimant may not have "good cause" to refuse a proffered job if he has been unemployed for a substantial time, even if the proffered work is lower in grade or entails a decrease in wages.

is still a good present expectancy of obtaining other
employment more nearly proportionate to the ability of
the worker may become suitable if that expectancy is
not realized within a reasonable time."

What is a reasonable time must be determined
as a question of fact under the circumstances of
each individual case. In the instant case, however,
the Appeal Board totally failed to consider "rea-
sonable time" in adjudicating Keith's disqualifica-
tion for benefits. The Appeal Board relied on the
erroneous rule in *Losada* as follows:

"The Appeal Board in considering a claimant's length
of unemployment as a test of suitability under Subsec-
tion 29(6) also found in *Losada (supra)* that a claimant
in an unskilled occupation should accept work when
offered at the time of his layoff where the offer is for
work which is suitable in all other respects."

Another question as to "reasonable time" may
be involved. Since no consideration was given as to
what would be a "reasonable time" under the
circumstances, there was no consideration as to
whether there was a "suitable" job available at
the culmination of that "reasonable time". There-
fore, if Keith was disqualified for benefits for fail-
ure to accept the Hamtramck job at the time
offered, immediately upon his layoff, then he was
improperly penalized for having assayed, unsuc-
cessfully, to locate more desirable employment (if,
in fact, there is a finding that he was making such
a search for employment—a point on which the
record is also scanty).

In passing, it must be pointed out that "reasona-
ble time" is not a license to malinger in the search
for work. An eligibility condition provided for by
MCLA 421.28(1)(a); MSA 17.530(1)(a) is that:

"He [the claimant] has registered for work at and thereafter has continued to report at an employment office in accordance with such regulations as the commission may prescribe *and is seeking work."* (Emphasis added.)

## V —Suitable Work

The Appeal Board reversed the referee principally because of a difference of opinion as to what constituted "suitable work". The referee spoke also for the claims investigator when he stated in his decision that:

"As applied to the facts of this case, it must be found in view of the evidence in this matter, that the claimant did not fail without good cause to report to his former employer for an interview concerning available suitable work because the work that would have been offered to the claimant as an assembler was work that he had never performed and for which he. had no experience or training.

"In addition, claimant would not have been recalled for work as a washer-degreaser at the Detroit Tank Plant of the employer if an opening occurred while he was working as an assembler at the Hamtramck Assembly Plant. Claimant was recalled to the Detroit Tank Plant as a washer-degreaser on August 4, 1969."

In contrast, the Appeal Board stated in its decision:

"It is the opinion of the Appeal Board that the claimant's occupation as a washer and degreaser was basically unskilled work and the offer of work as an assembler was generally similar in character to the work for which the claimant had previously received wages. * * * We find that the notice of interview given by the employer to the claimant was for suitable work because it entailed a classification generally similar in character to his previous classification * * * ."

It is clear that the Appeal Board relied heavily on a simplistic, dehumanized standard in determining the suitability of the proffered Hamtramck work: the claimant's previous work is "basically unskilled work"; the available work is unskilled work; therefore, it is suitable, Q.E.D. Furthermore, the Appeal Board brushed off Keith's concern about being locked out of a chance of recall to the Tank Plant by an inapplicable reference again to *Losada.*

The MESA does not leave to speculation the tests to be applied in determining the "suitability" of work. Specific standards are set out in § 29(6) of the act. The Appeal Board failed in this case to consider whether other jobs were available in Keith's customary work, not threatening to his health, safety, or morals, nor beyond his physical capability, and within a reasonable distance from his home, because the "claimant * * * has not raised any objections as to [these suitability factors]." This reasoning is erroneous. The fact that a claimant does not document more explicitly his objections to the proffered work, does not render him disqualified from benefits, in the absence of more thorough investigation by the board.

While there is considerable case authority that the burden of proving *eligibility* under § 28 rests on the claimant, *Clapp v Unemployment Compensation Commission,* 325 Mich 212, 221; 38 NW2d 325, 328 (1949); *Cassar v Employment Security Commission,* 343 Mich 380, 402–403; 72 NW2d 254, 257 (1955),[3] the burden of proving *disqualification*

---

[3] Note, however, that there are exceptions to this broad principle: for example, the burden of establishing eligibility shifts where the relevant facts are peculiarly within the knowledge and control of the employer. *See Michigan Tool Co v Employment Security Commission,* 346 Mich 673, 679–680; 78 NW2d 571, 574 (1956); *Fresta v Miller,* 7 Mich App 58; 151 NW2d 181 (1967).

is specifically assigned by the act to the board.[4] Under § 29, the fact-finding of the Appeal Board is guided by standards setting out what it "shall consider" in ascertaining the suitability of substitute work for purposes of disqualification.[5] Section 29(6) provides:

"In determining whether or not any work is suitable for an individual, the commission shall consider the degree of risk involved to his health, safety and morals, his physical fitness and prior training, his experience and prior earnings, his length of unemployment and prospects for securing local work in his customary occupation, and the distance of available work from his residence."

Furthermore, the hearing before the Appeal Board is not truly an adversary proceeding. In an administrative proceeding the claimant need not secure the representation of counsel, as the board itself is charged with investigation as well as adjudication of claims properly presented to it. Thus, Keith was not represented by counsel at the

[4] Altman aptly distinguishes eligibility and disqualification for purposes of burden of proof in his book *Availability for Work,* p 81:

"An eligibility requirement is a statutory *condition which a claimant must meet* before being entitled to receive benefits; a disqualification is a postponement, reduction, or cancellation of the benefit rights of *an already eligible claimant.*"(Emphasis added.)

This distinction is also recognized by the United States Supreme Court decision in *California Department of Human Resources Development v Java,* 402 US 121; 91 S Ct 1347; 28 L Ed 2d 666 (1971) which prohibits suspension of unemployment compensation benefits to claimants who have been found eligible for benefits, when an employer takes an appeal from an eligibility determination. If disqualification is subsequently determined, the state unemployment compensation procedures now contain provisions for recoupment.

[5] Similar factors are backbone provisions of the Federal Social Security Act, 49 Stat 620 (1935), 42 USCA 301 and most other states' unemployment compensation laws. *See* Larson & Murray, *The Development of Unemployment Insurance in the United States,* 8 Vand L Rev 181 (1955); Sanders, *Disqualification for Unemployment Insurance,* 8 Vand L Rev 307 (1955); Menard, *Refusal of Suitable Work,* 55 Yale LJ 134 (1945).

initial determination of his claim by the Appeal
Board, although counsel for the employer was
present.

Therefore, even if the evidence submitted by the
claimant is insufficient to establish all pertinent
facts, the burden is on the Appeal Board to further
investigate whatever evidence is necessary to
make informed findings of fact. To that end, the
board is empowered to subpoena and examine
witnesses other than those furnished by the claim-
ant or the employer. MCLA 421.9; MSA 17.509.

On the basis of its limited investigation of the
factors bearing on the suitability of the work
proffered Keith, the board was not warranted in
disqualifying him from benefits solely because he
refused to attend the Hamtramck interview.[6]

A. *Distance of Available Work from Claimant's
Residence*

Whether the proffered substitute work will re-
quire moving or long-distance commuting is a
serious consideration for an unemployed worker.

Like several of the other § 29 factors, "distance
of available work" varies inversely with increasing
time. At the time of initial unemployment, and for
a reasonable time immediately thereafter, a
worker should be able to restrict his search for
available "suitable" work to his home locality and
yet continue to qualify for benefits. But as weeks
pass, it becomes increasingly incumbent upon the

---

[6] *Compare Hagadone v Kirkpatrick,* 66 Idaho 55, 57–59 154 P2d
181, 182 (1944). The claimant, who had worked for 27 years as a
bandsaw filer was offered within a month of being laid off two jobs,
one firing a boiler, the other "common labor", which he refused on
the grounds of hazard to his health. He was denied unemployment
compensation. The Supreme Court of Idaho found that the Appeal
Board's inquiry into the situation was not sufficiently exhaustive to
establish an adequate basis for the factual finding that the claimant
had failed to accept suitable work. The case was remanded to the
board for more thorough investigation of the factual circumstances of
the compensation claim.

claimant to seek work beyond his immediate community.

Evidence that the worker has been laid off temporarily is one consideration to be weighed in each case. A worker who is laid off for an annual model change requiring a few weeks, and has good prospects of recall, is more justified in refusing to accept work involving extensive commuting to another locality, than is a claimant whose prior work has been permanently terminated, or whose work is strictly seasonal.

The distance factor also varies inversely with the demand for labor. Thus, if there is a labor shortage in a community within a reasonable distance, and an obvious surplus of labor in the locality where the worker has been employed and lives (due to a plant shutdown or widespread layoffs, for example) the claimant may be expected in a shorter time to seek work where it exists.

The record in this case discloses few facts regarding the distance of available work. There is a statement by the employer's attorney that the Hamtramck Plant was only five miles from Keith's home in Warren, as compared with the three miles he was traveling to the Tank Plant. Of course, it is not clear that distance was a factor in Keith's refusal to attend the Hamtramck interview. Keith testified that he had applied for substitute work at "bump shops" and "collision places" in the neighborhood, but he also filled out an application at Chevrolet, and there is no finding in the record as to where Chevrolet's plants are located.

The temporariness of Keith's layoff should also be taken into consideration. He had been laid off from January to March of that same year, then reemployed for nearly two months prior to the layoff at issue here, which lasted for three and a

quarter months. Whether recall was sufficiently
imminent to warrant Keith's decision to limit his
search for work to the City of Warren, if in fact
that is what he did, is a question for fact-finding
by the Appeal Board.

B. *Prospects for Securing Local Work in His
Customary Occupation*

An important factor in determining "suitability"
is the claimant's present expectancy of obtaining
other employment similar to his customary occu-
pation. An offer of employment is not "suitable" if
it requires a worker who still has fair prospects of
securing work in his customary occupation to step
down to work of substantially less desirability or
grade before he has had a reasonable chance to
look for work in his own line.

"Acceptance of such employment might conceivably
condemn the worker permanently to a scale of employ-
ment lower than that to which his training, skill, and
industry fairly entitle him." *Pacific Mills v Director of
Division of Employment Security,* 322 Mass 345, 350; 77
NE2d 413, 416 (1948).

Preservation of worker skills and utilization of
full training and experience should be important
factors in administering the MESA.

As long as an individual does not reduce his
prospects of employment to such an extent that he
no longer has any opportunity to secure work, and,
in effect, removes himself from the labor market,
he has a right to an occupational choice. At the
outset of unemployment, a claimant's customary
work may be the only work that is "suitable" for
him. As joblessness continues, the scope of custom-
ary work expands to other related, "similar" jobs.
"Similar" work must refer to job content and work
conditions. Not until the length of unemployment

has been substantial and the claimant has been
allowed "a reasonable time" to find work within
his limitations, may work of substantially lesser
grade or entirely different nature be deemed "suit-
able".

The record in the present case does not disclose
whether any other automotive manufacturers had
available subassembly work in claimant's classifi-
cation of painting or operating a washer-degreaser
machine. The only fact brought out by the Appeal
Board is that the wage rate at the Hamtramck
Assembly Plant was $.13 an hour higher than the
amount Keith had been earning as a machine
operator at the Tank Plant. Having the added
wage in mind the Appeal Board found the prof-
fered work suitable with the facile conclusion that
the occupation of machine operator and work as
an assembler are "generally similar in character",
because both are "basically unskilled work".

On the contrary, there may be lower and higher
grades of unskilled work as well as of skilled work.
Stated otherwise, some jobs are less desirable than
others. As Altman observes in his book, *supra,* p
160:

"Distinctions in kind of work may be based upon size
of establishment, tools, processes, and materials used or
customers served. The degree of skill, experience,
knowledge, responsibility, and training involved in the
work may also serve as criteria of classification. What-
ever classification bases are used, they must reflect
differences among jobs in the performance required of
the worker."

Keith's brief argues that assembly line work is a
substantially lower job classification than work
operating a machine on a subassembly in terms of
the skill required to perform the limited number
of tasks on the line, the pressure, and the lack of

control over the pace of the work. He presents psychological, economic, and sociological survey evidence from newspapers and magazines in support of his arguments regarding the undesirability of working on a main conveyor belt assembly line.

The MESC contends in its brief, however, that such articles are objectionable because included for the first time on appeal, and because they represent an attempt to introduce new facts which should have been offered at the hearing before the referee. They contend that the appellees have been denied an opportunity to object to the evidence on the grounds of materiality, or to rebut it by contrary documentation.

Without deciding at what point it should be admissible, such evidence is highly relevant to distinguishing kinds of work for purposes of adjudicating "suitability", and, therefore, properly may be an area for administrative inquiry and notice. Under the liberal evidentiary rules of the administrative forum, legislative facts are admissible when the agency is developing law or policy—that is, acting legislatively, which is the case when ruling on the meaning of "good cause", "a reasonable time" and "suitability." See 2 Davis, Administrative Law Treatise, § 15.03; see also the Administrative Procedures Act, MCLA 24.277; MSA 3.560(177). Of course, the opportunity to offer rebuttal evidence of the same nature must be available to the employer as well.

For purposes of this appeal, we may take notice judicially of the fact that assembly line jobs are ranked very low in a number of studies of automobile worker attitudes.

According to Chinoy's study, the general consensus among automotive workers is that assembly line jobs are the least desirable in the factory

because of the unrelenting mechanical pacing of
the conveyor belt.[7] The speed of the line controls
and a worker is unable to slow the pace even if he
is behind, and cars are "bunching up" on the line.
The worker cannot even go to the toilet unless a
"utility man" is available to replace him. Repair
and utility men alone had much positive to say
about the assembly line according to Chinoy's
survey, and he believes this is because their func-
tion is to substitute at all points in the line;
consequently, they are able to perform much more
varied tasks. On the basis of interview statistics,
Chinoy concluded that the line workers almost
unanimously wanted to secure some other kind of
job, and that the preferred jobs were those that
had a "longer time cycle", that is, those in which
the operation extended over several minutes, or
those that required several operations rather than
one. Chinoy, *Manning the Machine—The Assem-
bly-Line Worker,* in *The Human Shape of Work*
(Berger ed 1962), pp 58–60.

Similarly, most workers interviewed by Walker
and Guest in their comprehensive 1952 study ob-
jected to the mechanical pacing of the assembly
line, and 85% said they would prefer more variety
in their work. In the automotive plant studied by
Walker and Guest, 32% of the workers had one
operation jobs; 13% performed two operations;
23% from three to five operations; 16% from five
to ten operations; and 16% more than ten opera-
tions. Thus, two-thirds of the automotive assembly
jobs consisted of fewer than five operations. See

[7] Sixty vehicles an hour, 440 cars a shift, 880 a day, roll off the Ford
Rouge assembly line, while the rate at the most fast-paced assembly
line at the Lordstown, Ohio, Vega Plant is 101 cars an hour, which
leaves the worker only 36 seconds to perform his assigned tasks on
each car! *See* Serrin, " * * * *And Watching the Fords Go By at
Rouge",* The New York Times (November 9, 1972) part 2; and Garson,
*Luddites in Lordstown,* Harper's Magazine (June, 1972), p 68.

Blauner, *The Auto Worker & the Assembly Line: Alienation Intensified* in *Alienation & Freedom* (1964) ch 5, p 97. Blauner found, moreover, that workers were appreciative of the differences between a job with one or two operations, such as putting in a screw and tightening it with an air-driven screwdriver, and a job with three or four operations. *Id,* pp 97–98.

Kornhauser, in his study of Detroit automobile workers, used a measuring index of "mental health", based on turnover, absenteeism, dispensary visits, and industrial accident statistics, and found a considerable differential between the "mental health" of semiskilled workers (65% had low mental health) and of repetitive semiskilled workers (90% had low mental health). He concluded that the claim that low-skilled employment is an emancipation for the unemployed was totally without foundation. See Kornhauser, *Mental Health of Factory Works: A Detroit Study,* 21 Human Organization 43 (1962).

Another accusation that is frequently levelled at assembly line work is that it is dehumanizing. Perhaps this point is made most vividly in Charlie Chaplin's famous film, "Modern Times" (1936), in which he poses in extreme form the human problems created by mechanization. Half of the workers who labored on mass production lines interviewed by the Nader study group, felt unable to make better lives for themselves. See Lasson, *The Workers* [A Forward] (1972) p 7.

Furthermore, sociologists report that the assembly line process limits the possibility of normal human communication and leads to absenteeism and quits because the sheer volume of the noise makes it difficult to converse; few jobs require collaboration with others; the speed of the line

prohibits friendly association; and the work is depersonalized. See Chinoy, *supra,* pp 71–72. Boredom, which has been characterized as a serious pathology in itself,[8] is a problem for assembly line workers who not only are restricted to mechanized tasks, but are prohibited by the pace of the conveyor belt from exercising any initiative or imagination in performing their tasks. See Kremen, *"Lordstown—Searching for a Better Way of Work",* The New York Times (September 9, 1973), section 3.

In contrast, work on the subassemblies is highly preferred, according to Blauner's study, because of the comparative freedom of the job in terms of controlling the pace of production. Whereas the line worker must do all the work that the conveyor belt brings, the machine operator need only approximate his production quota each day. Also, subassembly workers can control their output to a degree by building up "banks"—that is, parts completed during an all-out work period can be stored up around the workbench, permitting greater leisure later in the day. See Blauner, *supra,* p 103.[9]

It is clear, upon examining the Chrysler Job Code description of Keith's job, "Washing and Degreasing Machine Operator", that this is subassembly work, as the operator has a number of different tasks to perform, and, importantly, controls the starting and stopping of the process rather than being controlled by it. The job description is:

"Operate mechanical washing and degreasing equip-

---

[8] *See* Hubb & Heron, *The Pathology of Boredom,* Scientific American (January, 1957).

[9] Examples of subassemblies include glass cutting for windows and windshields, equipping engines with pistons, rods, crankshafts and other major parts, assembling the body of the car, and painting the body during a five-and-one-half-hour process. *See* Serrin, *supra,* p 27.

ment employing a cleaning agent to remove oil, grease and dirt from parts.

"Equipment consists of various arrangement of tanks, pumps, stills, spray jets, air jets, control valves, sheet metal cabinets and hood and aprons, conveyors and hoists and baskets for handling stock. May be hand operated, automatic, or semi-automatic.

"Then, to paraphrase the description, the operator:

"(1) Loads the conveyor which carries the stock through the machine

"(2) *Starts and stops* the machine

"(3) Operates pumps

"(4) Manipulates valves

"(5) Maintains the volume of solutions

"(6) Operates distilling and reclaiming apparatus

"(7) Performs other duties necessary to the operation when such services are not otherwise provided

"(8) Loads stock on conveyor to the phosphate coating tank, visually inspects for proper coating, and maintains solution in coating tanks

"(9) Unloads conveyor which carries stock through machine."

We must recognize, of course, that the studies of which we have taken judicial notice are subject to rebuttal, both in terms of the criteria and procedure used for analyzing the data (consisting largely of verbal worker responses), and in terms of the assumptions made. For example, the assumption that dissatisfaction with the job indicates growing alienation and frustration with the work process is subject to dispute. Blauner observes that a minority of workers in Walker and Guest's study actually enjoyed the challenge of "keeping up with the rapid-fire line". See Blauner, *supra,* p 117. Blood and Hulin argue in their study, *Alienation, Environmental Characteristics & Worker Responses,* Journal of Applied Psychology (1967), vol 1, that alienated workers may be happiest when

given a job which is regimented and demands little personal involvement.

The Appeal Board heretofore, on determination and redetermination, has made inadequate findings in regard to the "suitability" of the Hamtramck work because its findings of fact fail to reflect the differences between the jobs of line assembly and subassembly machine operation work in terms of the respective job content and the performance required of the worker. In this regard, survey studies of work conditions and attitudes might significantly aid the board in assessing the "suitability" of substitute work which differs from the customary occupation, whether skilled or unskilled, of the unemployed individual.

In the event the board on redetermination made a finding using this and other data, this Court might be called upon to finally judge such data to determine whether the Appeal Board's findings were properly supported under MCLA 421.38; MSA 17.540; Const 1963, art 6.

C. *Claimant's Length of Unemployment*

The Appeal Board begged the question of length of unemployment by its determination that:

" * * * a claimant in an unskilled occupation should accept work when offered *at the time of his layoff* where the offer is for work which is suitable in all other respects." (Emphasis added.)

A worker, unemployed through no fault of his own, may refuse work offered immediately after separation from his last job which is outside the ambit of his customary occupation or training. Such justification for refusal diminishes, however, as the period of unemployment lengthens. See *Dubkowski, supra,* 150 Conn 278; 188 A2d 658; *In re B B Troutman,* 264 NC 289; 141 SE2d 613

(1965); and *American Bridge Co v Unemployment Compensation Board,* 159 Pa Super 74; 46 A2d 510 (1946).

The length of unemployment that is permissible before benefits are barred, cannot be honed down to a rigid yardstick. It is a fact question which must be determined on the basis of the circumstances involved in each individual case. See *Di Re v Central Livestock Order Buying Co,* 246 Minn 279; 74 NW2d 518 (1956). Where there is a reasonably early expectancy of recall to the claimant's prior place of employment, a somewhat longer duration of unmitigated unemployment might be tolerable. Leeway might be granted to workers in certain work specialties where the state has a strong interest in maintaining the worker's skill. Moreover, more lenience might be accorded to workers for whom the search for work is particularly difficult.[10]

---

[10] According to statistics, young unskilled automobile workers may encounter special difficulty in securing temporary employment pending recall. While unemployment is a serious problem for all blue collar workers, statistics show that more negative job tasks tend to be jobs with greater risks of unemployment. *See* Sheppard and Herrick, *Where Have All the Robots Gone?* (1972), p 59; *see also* Ribicoff, *The Alienation of the American Worker,* Saturday Review (April 22, 1972), pp 29–34. Furthermore, the unemployment rate among unskilled workers tends to be six to eight times that of the skilled professional-technical group. Gordon, *The Goal of Full Employment* (1967), p 6. Meanwhile, employment in the automobile plants is decreasing, *MESC Annual Report* (1970), p 11, and the percentage of the labor force that is unemployed has been steadily increasing in Michigan from 4.2% unemployed for the fiscal year ending June 30, 1969, to 5.2% unemployed at that time in 1970, *MESC Annual Report* (1970) p 11, to 8.0% in 1971, and 8.4% unemployed according to the last report in 1972, *MESC Annual Report* (1972), p 13. Moreover, the unemployment figures for automobile workers have always exceeded figures in other industries. Statistics for 1970, for example, indicate that 100,000 of 740,000 automobile workers were laid off for varying periods during the year. *See* Gooding, *Blue Collar Blues on the Assembly Line,* Fortune (July, 1970), p 112. And finally, unemployment has always been substantially higher among young workers. *See* Zeisel, *A Profile of Unemployment,* in *Men Without Work: The Economics of Unemployment* (Lebergott ed 1964), pp 115–117; and Gordon, supra, pp 5–6.

Keith was unemployed for three-and-one-third months before being recalled to the Tank Plant. Chrysler notified the MESC of Keith's possible disqualification from benefits for failure to attend the Hamtramck interview on the date that the Hamtramck Plant closed for model changes, July 18, 1969, or after he had been unemployed for two-and-one-half months.

The Appeal Board made no finding regarding the crucial factor to be determined regarding length of unemployment: whether the assembly line work at Hamtramck was in fact held available for Keith until July 18, or whether it was treated as forfeited by Chrysler after Keith failed to respond to the telegram notice of interview, dated May 2. If the job was in fact held available, and the claimant was so advised at a point when claimant could no longer seek neighborhood and non-assembly work it *may have become* his duty, depending on evidence regarding the other statutory factors, to accept the proffered employment.

It should be clear, however, that length of unemployment is not a penalty provision. It operates to limit the claimant's choice only because the passage of time is an indicator with regard of other statutory factors, such as prospects for securing work in the customary occupation. Thus, isolated attention to the length of unemployment alone, and not in the context of all the circumstances of the claim, would normally be improper.

D. *Claimant's Prior Earnings*

The Appeal Board found that "the hourly rate the claimant would have received at the Hamtramck Assembly Plant was higher than the hourly rate the claimant had received at the Detroit Tank Plant". This "even higher hourly rate than he had previously received" amounted to $0.13 an hour.

As long ago as 1950, Altman observed that most courts required evidence of larger differentials than five or ten cents to consider the worker in a financial position inferior to his prior employment, or vice-versa for purposes of determining suitability. While a claimant might associate wages with the job he wants, it is improper for the board to fall into the pitfall of looking at comparable wages of different unskilled jobs as a measure of the *similarity* of the work. Wages bear solely on the *suitability* of work for a particular individual with particular work history and training. See Altman, *supra,* p 162.

A worker may at the outset of unemployment demand a wage in parity with that he has previously received, and may even refuse jobs paying lower wages. *American Bridge Co v Unemployment Compensation Board of Review,* 159 Pa Super 77; 46 A2d 512 (1946). Work at substantially lower wages should not be deemed "suitable" unless the claimant had a reasonable time to seek available jobs for which he has the capability, at a rate of pay commensurate with his prior earnings. *Bayly Manufacturing Co v Department of Employment,* 155 Colo 433, 441; 395 P2d 216, 220 (1964). But, as the length of unemployment continues, the worker may have to lower his financial sights. See *Hallahan v Riley,* 94 NH 48; 45 A2d 886 (1946).

E. *Experience of the Claimant*

The Appeal Board found that Keith had had previous work experience "as a washer and degreaser * * * except for four months when he held the classification of 'painter tank'". But on the basis of *Losada,* the board found that the claimant's prior work record and experience had been in unskilled types of work which he was able to perform after brief training on the job and it

concluded, therefore, that work as an assembler,
which was "generally similar in character" was
"suitable". As stated above, reliance on *Losada* is
misplaced.

Experience means work history and includes not
only the description of the work which the claim-
ant has performed in the past, but, further, the
degree of skill, strength, knowledge, and responsi-
bility involved in performing that work. Examina-
tion of these considerations should bring out
whether the difference between the previous and
the proffered work is frivolous or significant
enough to render the work unsuitable, at least for
the early period of unemployment. See *Dubkowski,
supra; In re B B Troutman, supra;* and *Pacific
Mills, supra.*

F. *The Claimant's Prior Training*

In administering the act, the Appeal Board is
directed by statute to give consideration to the
claimant's prior training. No consideration was
given to that factor here, beyond noting Keith's
prior work experience, and concluding that "work
as an assembler [is] generally similar in charac-
ter".

Subject to the exception that a lengthy period of
unemployment may require a claimant to accept
work which does not utilize his prior training, a
claimant is entitled to a reasonable length of time
within which to seek employment commensurate
with his training and experience, with appropriate
rate of pay. See *Shay v Unemployment Compensa-
tion Board of Review,* 424 Pa 287; 227 A2d 174
(1967). Nothing in the statute discriminates
against the unskilled worker, nor limits considera-
tion of "training" to skilled workers alone. Even if
Keith could have been trained quickly to perform
the assembly line work, his right to seek work in

the occupation for which he had training, at his prior level of competence, cannot be diminished, any more than the increasing length of unemployment operates to diminish that right for any other worker who has put in a year on the job.

G. *Claimant's Physical Fitness*

The board dismissed the need to make a finding regarding Keith's physical fitness to perform assembly line work because Keith did not object to the proffered Hamtramck work on the basis of physical fitness. Clearly, physical fitness is not the crux of Keith's case, as he is 19 years old, and appears to be fit. But under the statutory command that this is a factor it "shall consider", the burden is on the board to go beyond mere assumption and elicit sufficient facts on which to base its findings.

Regardless of the length of unemployment, work to be "suitable" must be such work as the employee is reasonably capable of performing in terms of strength, endurance, coordination, psychological stability and learning ability. In considering the physical fitness of a claimant for work, personal restrictions based on physical disability or limitations, and the character of the labor proffered is relevant as long as it does not unreasonably narrow the field of the claimant's availability for work. Prior experience and training are important in weighing physical objections to proffered alternate employment.

In *Elko v Appeal Board,* 5 CCH Un Ins Rep Mich ¶ 8557 (Wayne Cir No 278, 116, 1956), the Wayne County Circuit Court held that the claimant, who had worked for six years as a piece assembler of plows, had "good cause" to refuse temporary work as a spot welder on an automotive assembly line. The claimant refused the work

because he feared that he would hurt himself operating the welding gun which was heavy and emitted sparks. It is significant that the claimant had taken other temporary work during the period of unemployment as a press operator, and, subsequent to refusing the welding job, he offered to take any available work that he was capable of performing. When no other work was offered, he succeeded in obtaining on his own a job wheeling bricks in a wheelbarrow at another automotive plant, and he worked there until recalled to his original job. His claim for compensation, therefore, was only for the short interim period of unemployment between jobs.

H. *The Degree of Risk Involved to the Claimant's Health, Safety and Morals*

The Appeal Board improperly passed off the burden of proof as to this factor also, on the basis that the claimant had not presented evidence of any threat to his health, safety, or morals.

The claimant may be justified in refusing on the ground of unsuitableness a job offer which might impair his health, safety or morals, without being precluded from receiving unemployment compensation benefits. Prior medical history of allergies, nervous condition, or weakness is relevant in this regard since the work is "suitable" only if the claimant is capable of performing it.

Moreover, statistical evidence regarding hazards to the health or safety of laborers generally in the proffered line of work, may be pertinent evidence in support of a claimant's refusal to work on the basis of hazard. Keith has offered evidence for consideration by the board concerning the psychological pressures of assembly line work which, though largely directed at mental health, is relevant as well to physical health, in view of the

established relationship between assembly line work and dispensary visits and industrial accidents. See Kornhauser, *supra.*

While extremely hazardous work, for which the claimant has no prior training, might never be "suitable" substitute employment, merely increased hazard of alternate work would not justify continuance of compensated unemployment over an extended period of time, if the claimant is not actively seeking more suitable work.

The decisions of the Court of Appeals and the circuit court are vacated and reversed.

The decision of the Appeal Board is reversed. The record is remanded to the Appeal Board for further proceedings, with instructions to take such additional evidence, and make such findings, as are required, consistent with this opinion.[11]

T. M. KAVANAGH, C. J., and T. G. KAVANAGH, J., concurred with WILLIAMS, J.

LEVIN, J., did not sit in this case.

## *APPENDIX*

## *BIBLIOGRAPHY—STUDIES ON THE NATURE OF ASSEMBLY-LINE WORK*

## *BOOKS*

Altman, *Availability for Work: A Study in Unemployment Compensation* (1950).
Blauner, *Alienation & Freedom* (1964).

---

[11] Justice LEVIN has authorized me to say that if he were participating he would sign this opinion. *See Sheppard v Michigan National Bank,* 348 Mich 577, 603, 635; 83 NW2d 614 (1957); *Paley v Coca Cola Co,* 389 Mich 583, 596; 209 NW2d 232 (1973). *See also Browning v Paddock,* 364 Mich 293, 298; 111 NW2d 45 (1961).

Galbraith, *The New Industrial State* (rev ed 1971).

Gordon, *The Goal of Full Employment* (1967).

Klein, *Workers Under Stress: The Impact on Work Group Cohesion* (1971).

Lasson, *The Workers* [a Nader Report; afterword by Nader] (1972).

Myers & Shultz, *The Dynamics of a Labor Market* (1951).

Sheppard & Herrick, *Where Have All the Robots Gone?* (1972).

Tiffany, Cowan & Tiffany, *The Unemployed: A Social-Psychological Portrait* (1970).

Walker & Guest, *The Man on the Assembly Line* (1952).

*Work in America (Report of a Special Task Force to the Secretary of Health, Education, & Welfare)* (forward by Richardson 1972).

*Worker Alienation 1972 (Hearings before the Subcommittee on Employment, Manpower, & Poverty of the Committee on Labor & Public Welfare, United States Senate)* (1972).

## MAGAZINES AND ARTICLES

Blood & Hulin, *Alienation, Environmental Characteristics & Worker Responses,* 51 Journal of Applied Psychology 284 (June, 1967).

*The Spreading Lordstown Syndrome,* Business Week (March, 1972).

Chinoy, *Manning the Machines—The Assembly-Line Worker,* in *The Human Shape of Work* (Berger ed 1962).

Garson, *Luddites in Lordstown,* Harper's Magazine (June, 1972).

Gooding, *Blue Collar Blues on the Assembly Line,* Fortune (July, 1970).

Gooding, *It Pays to Wake up the Blue-Collar Worker,* Fortune (September, 1970).

Hebb & Heron, *The Pathology of Boredom,* Scientific American (January, 1957).

Korman, *Job Satisfaction,* in *Industrial & Organizational Psychology* (1971) ch 2, pp 138–178.

Kornhauser, *Mental Health of Factory Workers: A Detroit Study,* 21 Human Organization 43 (1962).

Ribicoff, *The Alienation of the American Worker,* Saturday Review (April 22, 1972).

Seligman, *On Work, Alienation, & Leisure,* 24 The American Journal of Sociology & Economics No 4 (1965).

*The World of the Blue Collar Worker,* Dissent (Winter 1972).

Wilensky, *Work as a Social Problem,* in *Social Problems: A Modern Approach* (Becker ed 1966).

Zeisel, *A Profile of Unemployment,* in *Men Without Work: The Economics of Unemployment* (Lebergott ed 1964).

## NEWSPAPER ARTICLES

Bose, *"Searching for Meaning in Work: The Loss of Purpose,"* The Washington Post (February 6, 1972).

Carlson, *"Focusing on 'Blue Collar Blues' ",* The Wall Street Journal (April 6, 1972).

Kremen, *"Lordstown—Searching for a Better Way of Work,"* The New York Times (September 9, 1973) section 3.

Salpukas, *"Workers Increasingly Rebel Against Boredom on Assembly Line,"* The New York Times (January 23, 1972).

Serrin, *" * * * And Watching the Fords Go By at Rouge,"* The New York Times (November 9, 1972) part 2.

## FILM

Chaplin, *"Modern Times"* (1936).